### In re 905 INTERNATIONAL STORES, INC., Debtor,

### Allan R. HOFFMAN and Robert Kaplan, Appellants,

v.

### 905 INTERNATIONAL STORES, INC., Appellee.

### No. 85–1253 C (5).

United States District Court, E.D. Missouri, E.D.

Dec. 30, 1985.

Douglas Lee Burdette, Clayton, Mo., for appellants.

Lloyd A. Palans, Clayton, Mo., for appellee.

Maury B. Poscover, Thomas M. Dee, St. Louis, Mo., for amicus curiae in support of appellee.

Barry S. Schermer, Clayton, Mo., for creditors committee.

## MEMORANDUM AND ORDER

LIMBAUGH, District Judge.

This cause is before the Court on appeal from an order of the United States Bankruptcy Court for the Eastern District of Missouri [1] pursuant to 28 U.S.C. § 158(a).

*Introduction*

Appellee 905 International Stores, Inc. (905) is a retail liquor chain with stores throughout the St. Louis, Missouri area. The company is currently in Chapter II reorganization proceedings. As a part of its reorganization strategy, 905 has as-

---

**1.** The Honorable Robert E. Brauer, United States Bankruptcy Judge for the Eastern District

of Missouri.

sumed a number of leases and seeks to assign them to other parties. On February 1, 1985, 905 requested permission from the Bankruptcy Court to assign to Western Auto its leasehold at 4055 South Service Road in St. Charles, Missouri. The lessors of the property, Allan R. Hoffman and Robert Kaplan, objected to this assignment. On March 12 and 15, 1985, the objectors and 905 appeared at a hearing before the Bankruptcy Court. After considering the evidence presented, the Bankruptcy Court on March 19, 1985, overruled the lessors' objection and approved the assignment. It is this decision the appellants challenge on appeal.

The Bankruptcy Court found that as a matter of law the leased property was part of a shopping center and, therefore, any assignment of that lease must satisfy the restrictions in 11 U.S.C. § 365(b)(3)[2] The Bankruptcy Court further held that the assignment of the lease in question satisfied the requirements of this provision. The objectors argued at the hearing and in their original briefs before this Court that the assignment would violate certain provisions in leases between the lessors and other tenants and would disrupt the center's tenant mix. *See* 11 U.S.C. § 365(b)(3)(C) and (D).

After reviewing the Bankruptcy Court's opinion, the record, and the relevant law, the Court became concerned that the property was not part of a shopping center and ordered the parties to brief this question. After considering the parties' supplemental briefs, the Court finds the property is not part of a shopping center for purposes of the § 365(b)(3) and, therefore, the require-

ments delineated in that provision are irrelevant. Accordingly, the Court does not consider whether the proposed transaction meets the strict requirements for assignments of shopping center leases.

*Discussion*

A debtor in a bankruptcy proceeding can streamline its operations and raise working capital by assuming and assigning executory leases and contracts. *See* 11 U.S.C. § 365. Ordinarily, to obtain the Bankruptcy Court's permission to assign a lease, a debtor need only provide assurance that the assignee will perform under the lease's terms. *See* § 365(f)(2)(B). However, Congress in 1978 and again in 1984 placed additional restrictions on assignments of shopping center leases in order to protect the rights of the lessors and the center's other tenants. *See* S.Rep. No. 98–70, 98th Cong., 1st Sess. (1983). Congress recognized that unlike the usual situation where a lease assignment affects only the lessor, an assignment of a shopping center lease to an outside party can have a significant detrimental impact on others, in particular, the center's other tenants. *Id.*

The Bankruptcy Code does not define "shopping center." Rather, the proper definition of this term "is left to case-by-case interpretation." *In re Goldblatt Brothers, Inc.,* 766 F.2d 1136, 1140 (7th Cir.1985). The legislative history of The Shopping Center Protections Improvements Act of 1982, S. 2297, which eventually became part of the Bankruptcy Amendments and Federal Judgeship Act of 1984, suggests that Congress did not intend to extend the protections of § 365(b)(3) to arrangements

---

**2.** (3) For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

    (A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

    (B) that any percentage rent due under such lease will not decline substantially;

    (C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

    (D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

like the Cave Springs Square area. In describing the type of arrangements it sought to protect, the Senate Judiciary Committee in its report focused on the interdependent character of shopping center tenants. S.Rep. 8–10. This relationship among tenants is usually "cemented by a series of master agreements, entered into by all the parties involved in a shopping center, that set forth in precise terms the rights and obligations of each party ... [and the] linchpin of this entire operation [a shopping center] is the freely accepted and openly negotiated contractual agreements." *Id.* at 8 (parenthetical comment added).

The record certainly contains some evidence that the premises in question is part of a shopping center. Some of the exhibits introduced before the Bankruptcy Court include a joint advertising circular featuring holiday specials at various Cave Springs stores, a newsletter for the area merchants entitled "Cave Springs Spelunker," and a brochure geared toward potential tenants in which the lessors depict the area as a shopping center. Further, the restrictive covenants the lessors filed in the St. Charles County land records in 1976 are entitled "RESTRICTIVE COVENANTS OF CLOVERLEAF PLAZA SHOPPING CENTER," and contain language in a whereas clause that expresses the lessors' "desire to preserve said tract of real estate as a first class shopping center ..."

However, an examination of the actual legal relationships among the various Cave Springs tenants demonstrates the absence of the contractual interdependence that Congress considered the "linchpin" of the typical shopping center. Hoffman and Kaplan have sold the underlying fee in several tracts of land that are nominally part of the Cave Springs sales area and, presumably, the new owners can exert virtually unlimited control over these areas. The only restrictions placed on operators at these premises are the restrictive covenants discussed above. While these covenants do apply to all the properties in the Cave Springs area, they are really no more than a building code. These covenants

place no restrictions on the manner in which an owner or lessee of a burdened area may operate its business. They do not create the type of interdependence which is the key to the shopping center structure and which is the aspect of this type of arrangement Congress sought to protect.

The Court does not have before it all of the lease agreements between the objectors and the other Cave Springs tenants. But, the Court has examined the leases for the properties occupied by 905 and Firestone. Like the restrictive covenants, these leases do not evidence the type of legally required interdependence that Congress intended § 365(b)(3) to protect.

The provisions of the Firestone lease are particularly instructive. It does not provide for percentage rents and does not give Firestone the right to relinquish its leasehold if the anchor tenant ceases operations. These types of provisions are hallmarks of the joint working arrangements Congress sought to protect. Use of percentage rent clauses encourages the inclusion of profitable, thriving businesses that generate consumer traffic for surrounding stores. *Id.* at 12. Anchor clauses "which commit the tenant to a lease term only so long as another designated tenant remains in the shopping center ... further manifest the symbiotic, interdependent nature of a shopping center." *Id.* at 9. The lease also requires Firestone to take care of its trash removal and maintenance needs, and does not require any participation with other Cave Springs merchants in joint activities.

The lease agreement between 905 and the lessors is similar in its failure to create the type of duties owing to other tenants that an assignment to a third-party might injure. The lease contains no anchor clause and provides for flat rental payments. It requires 905 to maintain its premises and does not require the company to take part in any joint activities that accrue to the direct benefit of the other tenants. Like the lease between the lessors and Firestone, the 905 lease contains language designed to protect another tenant—in the case of Firestone, Taco Bell and

in the case of 905, the lessee of the adjacent parcel. However, while these provisions, in a sense, create some duties owing from the individual lessees to other Cave Springs merchants, they do not approach the scope of a true master lease. Instead, these lease agreements represent a situational approach to the concerns of individual tenants, and not master leases which "are distinct from other leases of real property in that each lease arrangement memorializes not only the bilateral interests of the tenant and the landlord, but the multilateral relationships of every other tenant in the shopping center." *Id.* at 9.

Several other factors suggest to the Court that the property in issue is not part of a shopping center for purposes of § 365(b)(3). While the objectors have expressed a concern that assignment of the 905 lease to Western Auto would disrupt the area's tenant mix, it is not at all apparent that there is a tenant mix to disrupt. As mentioned above, the objectors have sold the fee interests in several of the tracts of land which are ostensibly part of the Cave Springs complex. The restrictive covenants are the only limitation on the use of these parcels, and they contain no restrictions on the type of businesses the owners can conduct. In addition, the lessors concede that just about any retail business is an adequate substitute for 905. This suggests that Cave Springs Square does not have the type of carefully structured tenant mix that Congress intended the new statutes to protect. *See Id.* at 8. Further, the property in issue is not part of a contiguous group of stores. It is a free standing building with its own separate parking lot.

The Seventh Circuit in *Goldblatt* based its finding that the property in issue there was not part of a shopping center on the absence of "typical indicia of shopping centers," in particular, a master lease, fixed hours of operation, common areas, and joint advertising. 766 F.2d at 1141. Of these four indicia, only one, joint advertising, is present here, and the evidence suggests that its use was limited. The Court in *Goldblatt* also looked to the intent of the developers. While Messrs. Kaplan and Hoffman produced evidence that they intended to develop the Cave Springs area as a shopping center, the actual legal relationships they established do not match the nomenclature they use.

The Court does not suggest the objectors have in any way failed to achieve their development goals. Rather, the Court simply holds that the 905 lease property is not part of a shopping center for purposes of 11 U.S.C. § 365(b)(3), and consequently, any assignment of the property is not subject to the strictures of that provision. The appropriate statutes, then, require this Court to determine only whether Western Auto can adequately perform under the lease terms. See 11 U.S.C. § 365(f)(2)(B). The Court finds that this is the case.

Accordingly,

IT IS HEREBY ORDERED that the order of the United States Bankruptcy Court for the Eastern District of Missouri overruling the objections made by lessors Hoffman and Kaplan to the assignment by debtor 905 of its rights under a lease of property located at 4055 South Service Road in St. Charles, Missouri, be and is AFFIRMED.

IT IS FURTHER ORDERED that the Bankruptcy Court's findings of fact and conclusions of law be and are MODIFIED to the extent they are inconsistent with this memorandum and order.