In re JOSHUA SLOCUM LTD d/b/a JS Acquisition Corporation.

Appeal of George DENNEY, Party In Interest.

No. 90–1072.

United States Court of Appeals, Third Circuit.

Argued July 31, 1990.

Decided Dec. 31, 1990.

Rehearing and Rehearing In Banc Denied Jan. 28, 1991.

---

George J. Marcus (argued), Jacob A. Manheimer, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., for appellant.

Robert F. Salvin (argued), Lashner & Lashner, Philadelphia, Pa., for appellee.

Before HIGGINBOTHAM, Chief Judge, and SLOVITER and ALITO, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, JR., Chief Judge.

This case concerns the power of the bankruptcy court to excise a paragraph from a shopping center lease. On November 21, 1988 (the "Filing Date"), Joshua Slocum, Ltd., a Pennsylvania corporation (the "Debtor"), filed a voluntary petition for relief under chapter 11 of the United States Code with the bankruptcy court. On February 16, 1989, the bankruptcy court appointed Melvin Lashner (the "Trustee") to act as trustee in the case pursuant to 11 U.S.C. § 1104. Appellant George Denney ("Denney") contends that the bankruptcy court erred in entering its orders excising paragraph 20 of the lease in question, and then authorizing the assumption and assignment of that lease, without paragraph 20, over his objections. He also maintains that the district court erred in affirming the bankruptcy court's decision. We agree with the appellant and therefore will reverse the district court's summary affirmance of the bankruptcy court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

The Debtor, Joshua Slocum, Ltd., d/b/a JS. Acquisition Corporation, began its relationship with Landlord, George Denney, in May of 1983 when Debtor signed a ten year lease for retail space at the Denney Block in Freeport, Maine. The Denney Block, which consisted of three buildings containing seven stores, was developed in two phases commencing in 1982 and completed in 1983. The first phase was undertaken by Cole Haan, a manufacturer and retailer of fine men's and women's shoes, of which Denney is the President. Cole Haan purchased and renovated a building on Main Street in Freeport, Maine, and gave Denney the option to purchase the building in the event that the stock of Cole Haan was acquired by a third person. When the capital stock of Cole Haan was purchased by Nike, George Denney exer-

cised his option to purchase the Cole Haan building.

Shortly thereafter, Denney purchased the building immediately adjoining the Cole Haan building and a third building separated from the second building by a courtyard. Architectural plans to develop the two new buildings in a manner consistent with the Cole Haan building as a common scheme were commissioned by Denney and presented to the Freeport, Maine planning board for approval.

The buildings comprising Denney Block front on Main Street and are part of the downtown shopping district in Freeport. The shopping district consists of a number of streets lined with stores. In addition to the Landlord's three buildings, the Denney Block has a courtyard located between two of its buildings and a parking lot behind the stores. George Denney owns the parking lot which is primarily for the use of patrons of the Denney Block, although according to local ordinance it is also open to the public (thus, it can be used by all persons who shop in the stores along Main Street, Freeport).

Debtor's lease, signed in 1983, along with the leases of some or all of the other Denney Block tenants, contains an average sales clause. This clause allows for Debtor or Landlord to terminate the lease if, after six years, Debtor's average yearly sales are below $711,245. A similar option also existed after the third year of the lease. At that point, either party held the power to terminate the lease if the tenant's average yearly sales were below $602,750.

The lease also contains a percentage rent clause. For the years currently remaining in the lease, this clause requires the tenant to pay additional rent in the amount of four percent of gross sales in excess of $1,175,-362. Otherwise, the base rent due in the final five years of the lease is $3,917.88 per month. The leases also require the tenants to provide Landlord with financial information concerning their business so that these lease provisions can be implemented.

Joshua Slocum, Ltd. filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code with the bankruptcy court. By application to the bankruptcy court dated February 2, 1989 (the "Application"), the Trustee requested authorization to assume and assign the Lease pursuant to 11 U.S.C. § 365. In March 1989, Denney filed written objections and a memorandum of law in opposition to the application with the bankruptcy court.

By opinion (the "opinion") and order both dated March 29, 1989 (the "interim order"), 99 B.R. 250, the bankruptcy court granted the relief requested in the Application and authorized the Trustee to assume and assign the Lease to European Collections, Inc. (the "assignee"). The bankruptcy court entered another Order on April 11, 1989 (the "final order"), setting forth fully the rights and obligations of the parties. In the opinion and the final order, the bankruptcy court held unenforceable and excised paragraph 20 of the Lease ("paragraph 20"), which provides that "in the event that Tenant's gross sales for the first six (6) lease-years of the term of this Lease do not average Seven Hundred Eleven Thousand Two Hundred Forty Five and 00/100 Dollars ($711,245.00) per lease-year either Landlord or Tenant may elect to terminate this Lease."

The court approved the assignment of the lease without paragraph 20 to European Collections. European Collection has begun occupancy and operation of a store in George Denney's premises in Freeport, Maine. Denney's consolidated appeals followed.

On May 31, 1989, the Trustee filed a motion to dismiss George Denney's appeal as moot. By Order dated December 21, 1989 the district court affirmed without opinion the bankruptcy court's opinion and final order and denied Trustee's motion to dismiss. On January 22, 1990, Denney appealed the district court order.

## II. DISCUSSION

### A. *Mootness*

■ Before we can turn to our discussion of the merits we must address the threshold issue of whether we have appel-

late jurisdiction. Appellee asks this court to dismiss this appeal as moot due to the landlord-appellant, George Denney's failure to obtain a stay pending appeal. Trustee argues that the principle of finality embodied in § 363(m) of the Bankruptcy Code should be applied to assignments under § 365 of that same statute. Further, Trustee maintains that such assignments, if made to good faith assignees, should not be subject to invalidation on appeal. We find the Trustee's argument inapposite to the situation presented. Denney has not challenged the assignment of the lease to European Collections. Accordingly, the issue before us is not the assignment of the lease, as the Trustee asserts, but rather whether the bankruptcy court had the authority to excise paragraph 20 of that lease. The request to dismiss as moot must be denied, because we find that under the facts of this case Denney was under no obligation to obtain a stay.

We note that only two provisions of the Bankruptcy Code, 11 U.S.C. §§ 363(m) and 364(e), specifically require that a party seek a stay pending appeal.[1] Appellee concedes that § 363(m) of the Bankruptcy Code does not apply to assignments of leases under § 365. We decline to interpret the mootness principles in such a way that would, in effect, create a third situation where parties are required to seek a stay, i.e., the assignment of leases under § 365. While § 363(m) contains a provision requiring a stay, the section that applies in this case, § 365, does not.

We have been willing to go beyond the statutory framework and dismiss an appeal as moot, where, *during the pendency of the appeal,* events occurred preventing the appellate court from granting effective relief. *See, e.g., In re Cantwell,* 639 F.2d 1050 (3d Cir.1981); *In re Highway Truck Drivers,* 888 F.2d 293 (3d Cir.1989). In *Cantwell,* the creditors appealed an order of the district court that dissolved a stay of discharge. The discharge appellants sought to be stayed was granted during the pendency of the appeal. The order granting the discharge had not been appealed. The sole issue before the court was the district court's order dissolving the stay. As Judge Sloviter noted, "even if we vacate that order—the relief appellant requests—it will not change the fact that the discharge, the act appellants sought to delay has been granted.... Hence, the propriety of the stay of discharge is moot." 639 F.2d at 1054. *Cantwell* is inapposite to the present situation. In *Cantwell,* unlike the matter at hand, the discharge of bankruptcy, i.e., the event occurring during the pendency of the appeal, had not been appealed. This Court's grant of a stay of that discharge would have been an empty gesture. Therefore, the court could not provide effective relief in that instance.

Similarly, in *Highway Truck Drivers,* during the pendency of the appeal, the state Supreme Court relieved the debtor of all liability. The state Supreme Court's decision was not before this court. Because no stay had been requested, no relief could be granted. "To hold otherwise would allow the district court to nullify retroactively a validly entered state court judgment, thereby emasculating the fundamental doctrines of federalism and comity." *Highway Truck Drivers,* 888 F.2d at 299. No such concern is present in the case *sub judice.*

In both *Cantwell* and *Highway Truck Drivers,* the event occurring during the pendency of appeal was a decision of a court. We do not imply that only an intervening judicial decree will moot an appeal. However, in neither *Cantwell* nor *Highway Truck Drivers* was the intervening court decision reviewable by this Court, thus in neither case could the appellant obtain effective relief in this forum.

---

1. 11 U.S.C. § 363(m) provides:

   The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pending of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

   Section 364(e) concerns the validity of debts and liens. *See* 11 U.S.C. § 364(e).

In the matter at hand, there has been no intervening event that altered the rights of the Trustee *vis-a-vis* Denney. The action the Trustee claims to have mooted this case, i.e., the assignment of the lease, is not the action appealed from, and not the action upon which we base our decision. The excisement of paragraph 20 is the action presently before us, and the Trustee has presented no argument to the effect that that issue has been mooted during the pendency of the appeal. Thus, effective relief can be granted in this case.[2]

In this instance, we find that no event has occurred during the pendency of the appeal to render Denney's appeal moot, nor are we precluded from granting effective relief. We find that we have appellate jurisdiction to hear the merits of this appeal. Accordingly, what has been done can be undone, if necessary, we can and will reverse the bankruptcy court's decision to hold unenforceable and to excise paragraph ·20 of the Lease.

### B. *Shopping Center*

The Bankruptcy Code imposes heightened restrictions on the assumption and assignment of leases for shopping centers. *See* 11 U.S.C. § 365(b)(3).[3] A debtor in a bankruptcy proceeding can raise working capital by assuming and assigning executory leases and contracts. *See* 11 U.S.C. § 365. Ordinarily to obtain the bankruptcy court's permission to assign a lease a debtor need only provide assurance that the assignee will perform under the lease's terms. *See* 11 U.S.C. § 365(f)(2)(B). However, Congress in 1978 and again in 1984 placed additional restrictions on assignment of shopping center leases in order to protect the rights of the lessors and the center's other tenants. *See* S.Rep. Nos. 98–70, 98th Cong. 1st Sess. (1983). Congress recognized that unlike the usual situation where a lease assignment affects only the lessor, an assignment of a shopping center lease to an outside party can have a significant detrimental impact on others, in particular, the center's other tenants. *Id.* However, the Bankruptcy Code does not define "shopping center." Rather, the proper definition of this term "is left to case-by-case interpretation." *In re Goldblatt Brothers, Inc.*, 766 F.2d 1136, 1140 (7th Cir.1985).

George Denney, the landlord of the Denney Block, wishes to take advantage of these heightened restrictions in order to block the assignment of the lease to European Collections. Thus, appellant Denney

---

**2.** While we are essentially in agreement with the dissent's well-reasoned analysis, we differ as to the appropriate starting point of the inquiry. If we started our analysis with the assignment, and not with excisement of paragraph 20, we would probably reach the same result. However, we do not accept the proposition that the action at issue in this case is the assignment of the lease. Indeed, the appellant states that the scope of review is limited to "whether the Bankruptcy Court has authority to excise Paragraph 20 of the lease and whether the Denney Block is a shopping center." Appellant's Brief at 8.

Nor do we, in this opinion, overturn "a transaction that has long since been consummated," dissenting opinion ("dis. op.") at 1093, or "annul a transaction which involves an entity over which we do not have jurisdiction." Dis. op. at 1095. We differ with the dissent's willingness to draw factual conclusions concerning the effect of this decision, when, in light of the bankruptcy court's decision to excise paragraph 20, neither the bankruptcy nor district court had an opportunity to consider the question. The bankruptcy court's observation that "[t]he parties all apparently agreed that accomplishing such a volume of sales in this time-frame would

be a difficult proposition" is inadequate support for the dissent's conclusion that our decision will undeniably have the effect of rescinding the lease.

**3.** That Bankruptcy Code provision addresses executory contracts and unexpired leases and provides in relevant part:

(3) For the purposes of paragraph (1) of this section, adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

(A) of the source of rent and other consideration due under such lease;

(B) that any percentage rent due under such lease will not decline substantially;

(C) that assumption or assignment of such lease will not breach substantially any provision, such as a radius, location, use or exclusivity provision, in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt substantially any tenant mix or balance in such shopping center.

contends that the Denney Block is a "shopping center" within the meaning of 11 U.S.C. § 365(b)(3). We agree.

However, the bankruptcy court agreed with the appellee, Trustee, and found that Denney Block was not a "shopping center" within the meaning of 11 U.S.C. § 365(b)(3). The court looked to *Collier on Bankruptcy* and two cases addressing the question of whether a particular arrangement of stores constitutes a "shopping center" for purposes of § 365(b)(3). *See In re Goldblatt Bros., Inc.,* 766 F.2d 1136, 1140–41 (7th Cir.1985); *In re 905 Int'l Stores, Inc.,* 57 B.R. 786, 788–89 (E.D.Mo.1985). Both of these appellate decisions affirm bankruptcy court determinations that the respective premises in question were not in "shopping centers."

In *Goldblatt,* although the court found the common ownership of contiguous parcels, the presence of an "anchor tenant" (Goldblatt) and joint off street parking adjacent to all stores was significant in deciding whether the arrangement at issue was a shopping center, those factors were not determinative. The court was persuaded by the absence of other typical indicia of shopping centers, i.e., a master lease, fixed hours during which the stores are all open, common areas and joint advertising, and particularly whether the stores were developed to be a shopping center. *See* 766 F.2d at 1141.

In *905 Int'l,* the court, in finding that the arrangement at issue in that case was not a "shopping center," was impressed with "the absence of contractual interdependence among tenants." 57 B.R. at 788. That case, like *Goldblatt,* also sets out several objective criteria in determining whether an arrangement is a "shopping center." In addition to contractual interdependence, these factors include the existence of percentage rent clauses, anchor tenant clauses, joint contribution to trash and maintenance needs, contiguous grouping of stores, a tenant mix, and restrictive clauses. Relying on the indicia pointed to in *Goldblatt,* the court found that only one of the four, joint advertising, was satisfied,

and concluded the stores did not comprise a shopping center.

■ The bankruptcy court utilized the correct criteria for determining what constitutes a "shopping center." The court's focus on the physical attributes of the Denney Block, however, i.e., the fact that it was located on a typical "Main St." in a downtown district, is not a factor laid out as dispositive in the Bankruptcy Code, Collier's treatise, or either of the above cited cases. Nor is there any intrinsic sense to the bankruptcy court's conclusion that the Denney Block's location makes it fall outside the purview of the definition of "shopping center." The court noted that "a shopping center brings to mind a configuration of stores which are not free-standing or detached in the sense that stores appear in a typical 'Main St.' downtown shopping district. Such a downtown shopping district is usually considered in many communities, as the *alternative* (emphasis in original) to the archetypal 'shopping center,' i.e., the large enclosed shopping mall." Bankruptcy Court Opinion (Appendix at 218). While it is true that the mall *is* the archetypal "shopping center," all shopping centers do not necessarily take the form of shopping malls.

■ Location is only one element in the determination of whether a group of stores can properly be described as a "shopping center." However, more significant are the following criteria sketched in Collier, *Goldblatt* and *905 Int'l:*

  (a) A combination of leases;
  (b) All leases held by a single landlord;
  (c) All tenants engaged in the commercial retail distribution of goods;
  (d) The presence of a common parking area;
  (e) The purposeful development of the premises as a shopping center;
  (f) The existence of a master lease;
  (g) The existence of fixed hours during which all stores are open;
  (h) The existence of joint advertising;
  (j) Contractual interdependence of the tenants as evidenced by restrictive use provisions in their leases;

(k) The existence of percentage rent provisions in the leases;

(*l*) The right of the tenants to terminate their leases if the anchor tenant terminates its lease;

(m) Joint participation by tenants in trash removal and other maintenance;

(n) The existence of a tenant mix; and

(*o*) The contiguity of the stores.

■ We do not think that the bankruptcy court gave adequate consideration to all of the factors described above and gave undue weight to the testimony that the Denney Block does not look like a shopping center. *See* Appendix at 98, 219. The bankruptcy court placed what it termed "the physical configuration" of the Denney Block at the center of its analysis, *see id.* at 219–20: "we find that the physical characteristics of the Denney Block *preclude* its characterization as a 'shopping center.' " *Id.* at 218. We are not convinced that the physical configuration of the property plays such a prominent role. Indeed, Collier notes that "the most important characteristic will be a combination of leases held by a single landlord, leased to commercial retail distributors of goods, with the presence of a common parking area." 2 Collier on Bankruptcy ¶ 365.04[3]. Except for contiguity of stores criterion listed above, the appearance of premises or their location within a downtown shopping district has not been cited as a factor in the determination of whether a group of stores is a "shopping center." All of the stores of Denney Block, except to the extent that they are separated by common areas, are contiguous.

Moreover, George Denney is the sole landlord of all the stores in the Denney Block. Those stores share and provide support for the maintenance of common areas. The stores are all retail distributors of goods subject to substantially similar leases which include both percentage rent provisions and clauses for the benefit of other tenants that restrict the type of goods that a tenant may sell. There is a mix of tenants at Denney Block. Cole Haan primarily sells footwear, Laura Ashley sells a variety of goods including clothing, wall paper and linens, Jones New York sells men's and women's clothing, Benneton sells sports wear, Class Perfume sells perfume and Christmas Magic sells Christmas decorations and ornaments. The plot plan for Denney Block was presented to the Freeport planning board as a common scheme.

The bankruptcy court found that there was no common parking because customers of stores other than those shops in the Denney Block also use parking lot located directly behind it. That common parking is available at the Denney Block is not obviated by the fact that according to local ordinance the public must also have access to that lot. Hence, the Denney Block satisfies, with the exception of joint advertising, the existence of a master lease and the right of a tenant to terminate the lease if the anchor tenant does so, all of the criteria for determining what constitutes a "shopping center," and all of the "most important" characteristics listed by Collier. Because the bankruptcy court did not adequately consider each of the factors enumerated above its reading of the Act was overly restrictive.

The provisions of Section 365 are intended to remedy three "serious problems caused shopping centers and their solvent tenants by the administration of the bankruptcy code." 130 Cong.Rec. S8891 (statement by the Hon. Orrin G. Hatch, a ranking majority member of the Senate Committee on the Judiciary and a Senate conferee), *reprinted in* 1984 U.S.Code Cong. & Admin.News 590, 598. Congress wished to alleviate the hardship caused landlord and tenant resulting from vacancy or partial operation of the debtor's space in the shopping center. Section 365 also insures that the landlord will continue to receive payments due under the lease. Finally, the statute guarantees to the landlord and remaining tenants that the tenant mix will not be substantially disrupted. Each of these serious problems was faced by Denney and the remaining shops after Joshua Slocum, Ltd. went bankrupt. We conclude that in light of the harms Section 365 was

intended to remedy, and after application of all relevant criteria, denying Denney and his tenants the protections of Section 365 would not further the congressional will.

Additionally, the legislative history of the Bankruptcy Reform Act of 1978 briefly addresses the definition of a "shopping center."

> A shopping center is often a carefully planned enterprise, and though it consists of numerous individual tenants, the center is planned as a single unit, *often* subject to a master lease or financing agreement. Under these agreements, the tenant mix in a shopping center may be as important to the lessor as the actual promised rental payments, because certain mixes will attract higher patronage of the stores in the center, and thus, a higher rental for the landlord from those stores that are subject to a percentage of gross receipts rental agreement.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 348 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6305 (emphasis added).

We think that the Denney Block fits within Congress' conceptualization of a shopping center. The use of the term "often" in the above quoted passage indicates that the existence of a master lease should not be determinative in this court's analysis. We also note that a "single unit" as described above does not have to be an enclosed mall as the bankruptcy court would have it, but rather could be properly conceived of as a cluster of three relatively contiguous buildings as with the Denney Block.

We conclude that Denney Block is a "shopping center" within the meaning of 11 U.S.C. § 365(b)(3) and should be entitled to its special protections.

### C. *Bankruptcy Court's Power to Excise Paragraph 20 of the Lease*

■ The bankruptcy court, in considering the motion of the Trustee, Melvin Lashner to allow the Debtor, Joshua Slocum, Ltd. to assume and assign its store lease with the Denney Block (*see* 11 U.S.C. § 365(a)), held that the average sales clause in paragraph 20 of that lease unenforceable because it is not material or economically significant to the landlord and/or landlord's other tenants. The bankruptcy court granted Trustee's motion to assume and assign the lease and deleted the average sales clause. Appellant, George Denney takes issue with the court's authority to excise paragraph 20 of his leasehold with Joshua Slocum, Ltd. We shall defer the issue of whether that clause was material until later in our discussion. However, we now turn our attention to the question of the bankruptcy court's authority to delete paragraph 20.

Paragraph 20 of Joshua Slocum, Ltd.'s lease at the Denney Block provides as follows:

Paragraph 20 ("average sales"):

> *Option to Terminate.* In the event that Tenant's gross sales for the first three (3) lease-years of the term of this Lease do not average at lease Six Hundred Thousand Seven Hundred Fifty and 009/100 Dollars ($602,750.00) per lease-year, either Landlord or Tenant may elect to terminate this Lease; and in the event that Tenant's gross sales for the first six (6) lease-years of the term of this lease do not average Seven Hundred Eleven Thousand Two Hundred Forty Five Dollars and 00/100 Dollars ($711,245.00) per lease-year, either Landlord or Tenant may elect to terminate this Lease. Such election must be made, if at all, by written notice to the other party received within thirty (30) days from the date of receipt by Landlord of the accountant's statement described in Paragraph 4(b) hereinabove; and termination shall become effective ninety (90) days after receipt of such notice....

Appendix at 15–16.

The bankruptcy court viewed this average sales provision as a cleverly disguised anti-assignment clause. The court stated:

> Perhaps the most novel issue raised by this motion is the enforceability of the "minimum sales" provision which, if enforced, would probably allow Denney to terminate the Lease in July, 1989. If

this provision were enforced, with EC having to incorporate the Debtor's sales record through February 20, 1989, the value of the Lease would obviously be nominal. EC's offer to pay $77,000 for the right to obtain an assignment of the Lessee was expressly predicated on its receiving the right to utilize the Debtor's former Freeport store for at least the remaining four years of the lease. It is certainly questionable whether, in the short time before EC could open the store and July, 1989, it could attain a sales volume, when combined with the Debtor's interrupted sales record, sufficient to meet that required as the minimum in the first six lease-years of the Debtor's lease.

Appendix at 227 (Bankruptcy Court Opinion). Working from the premise that Denney Block is not a "shopping center," the bankruptcy court held that the heightened protection accorded to non-debtor contractual rights under § 365(b)(3) [4] of the Bankruptcy Code does not apply and turned its attention to § 365(f) dealing with assump-

tions and assignments of lease in non-shopping center cases.[5] However, as discussed above, Denney Block is a "shopping center" and thus, § 365(f) does not apply.

■■■ The bankruptcy court does have some latitude in waiving contractual provisions when authorizing a trustee to assume and assign an unexpired lease. Section 365(b)(2) [6] on its face permits the court to ignore so-called *ipso facto* and forfeiture clauses. *See In re TSW Stores of Nanuet, Inc.*, 34 B.R. 299, 305 (Bankr.S.D.N.Y. 1983); *In re U.L. Radio Corp.*, 19 B.R. 537 (Bankr.S.D.N.Y.1982). However, the court's authority to waive the strict enforcement of lease provisions in the context of shopping center cases like this one is further qualified by § 365(b)(3) of the Bankruptcy Code.[7] Even under the tightly drawn definition of "adequate assurance" in the shopping center context, Congress did not envision literal compliance with all lease provisions; insubstantial disruptions in, *inter alia*, tenant mix, and insubstantial breaches in other leases or agreements were contemplated and allowed.[8] 11 U.S.C.

---

**4.** *See supra* note 3.

**5.** That provision provides in relevant part:
(f)(1) Except as provided subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
(2) The trustee may assign an executory contract or unexpired lease of the debtor only if—
(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

**6.** Executory contracts and unexpired leases.
(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
(A) cures, or provides, adequate assurance that the trustee will promptly cure, such default;
(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such

contract or lease, for any actual pecuniary loss to such party resulting from such default; and
(C) provides adequate assurance of future performance under such contract or lease.
(2) Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to—
(A) the insolvency or financial condition of the debtor at any time before the closing of the case;
(B) the commencement of a case under this title; or
(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.
11 U.S.C. § 365(b)(1), (2).

**7.** *See supra* note 3 for the language of this provision.

**8.** The court's authority to waive strict enforcement of lease provision in the non-shopping center cases will permit deviations which exceed those permitted in shopping center cases. *U.L. Radio*, 19 B.R. 537, 544. *See also In re Peterson's Ltd., Inc.*, 31 B.R. 524 (Bankr.S.D.N.Y. 1983) (a change in use was authorized to permit an assignment of a so-called high class tobacco shop to an assignee who sold discounted cigars); *In re Fifth Avenue Originals*, 32 B.R. 648 (Bankr. S.D.N.Y.1983) (a lease assumption and assignment from a high-class boutique selling clothing

§ 365(b)(3)(C), (D); *see also U.L. Radio Corp.*, 19 B.R. 537, 544; *TSW Stores*, 34 B.R. 299.

In this case, however, the bankruptcy court did not have the authority to excise paragraph 20 of the shopping center lease which addresses the landlord and/or tenant's option to terminate dependent upon the average sales generated by the tenant. We note that even if the Denney Block were not a shopping center, the bankruptcy court's authority to excise paragraph 20 of the lease is questionable. That paragraph must be read in conjunction with paragraph 4, the percent rent clause of the lease which provides a formula requiring Joshua Slocum, Ltd. to pay a percentage of the lease as specified on any amount in excess of the designated gross sales threshold for a given lease-year (*See* Appendix at pp. 3–4). These two clauses taken together clearly indicate that a bargained for element in this contract was that tenant, Joshua Slocum, Ltd., average a certain volume of sales as specified in paragraph 20 of the lease so that the Landlord could accurately calculate the minimum total rent expected pursuant to paragraph 4 of the lease. Even standing alone, paragraph 20 is an essential bargained for element of this lease agreement because it governs occupancy. We also note that paragraph 20 of the lease falls within the statutory meaning of "other consideration due" [9] under the lease, and without this clause the trustee could not give adequate assurance as to its future performance.

Congress has suggested that the modification of a contracting party's rights is not to be taken lightly. Rather, a bankruptcy court in authorizing assumptions and assignment of unexpired leases must be sensitive to the rights of the non-debtor contracting party (here, George Denney) and the policy requiring that the non-debtor receive the full benefit of his or her bargain. *See U.L. Radio Corp.*, 19 B.R. 537; *TSW Stores of Nanuet*, 34 B.R. 299. Congress' solicitous attitudes toward shopping centers is reflected in the legislative history regarding § 365(b)(3), which states:

> A shopping center is often a carefully planned enterprise, and though it consists of numerous individual tenants, the center is planned as a single unit, often subject to a master lease or financing agreement. Under these agreements, the tenant mix in a shopping center may be as important to the lessor as the actual promised rental payments, because certain mixes will attract higher patronage of the stores in the center, and thus a higher rental for the landlord from those stores that are subject to a percentage of gross receipts rental agreement. Thus, in order to assure a landlord of his bargained for exchange, the court would have to consider such factors as the nature of the business to be conducted by the trustee or his assignee, whether that business complies with the requirements of any master agreement, whether the kind of business proposed will generate gross sales in an amount such that the percentage rent specified in the lease is substantially the same as what would have been provided by the debtor, and whether the business proposed to be conducted would result in a breach of other causes in master agreements relating, for example to tenant mix and location.

H.R.Rep. No. 595, 95th Cong., 1st Session 348–49, *reprinted* in 1978 U.S.Code Cong. & Admin.News 5963, 6305; *see also* S.R. Rep. No. 95–989, *reprinted* in *id.* at 5787, 5845.

In excising paragraph 20, the bankruptcy court undermined both the Congressional policy and the statutory requirement under § 365(b)(3)(A) that the trustee give adequate assurance of "other consideration due" under an unexpired lease. We find that the bankruptcy court did not have the authority to excise paragraph 20 of the lease.

and accessories for both sexes to Diane von Furstenberg, a designer offering women's clothing and accessories, was approved).

9. *See* 11 U.S.C. § 365(b)(3)(A), *supra,* p. 1086.

### D. *Materiality*

■ Appellant takes issue with the bankruptcy court's conclusion that paragraph 20 of the lease at issue, allowing for the termination of the lease by either the landlord, Denney or the debtor-tenant, Joshua Slocum, Ltd., if certain minimum sales figure were not realized, was not enforceable. Central to the bankruptcy court's view was the notion that unless the landlord establishes that a leasehold is in a "shopping center," such a restrictive clause is only enforceable if the landlord is able to establish that such terms are material and jeopardize the economic position of the landlord and/or the landlord's other tenants. The bankruptcy court, working from the premise that the Denney Block is not a "shopping center," looked to case law interpreting § 365 of the Bankruptcy Code and distilled the concepts of "materiality and economic significance." Those cases state that "the [bankruptcy] court does retain some discretion in determining that lease provisions ... may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets." *In re Mr. Grocer, Inc.*, 77 B.R. 349, 354 (Bankr.D.N.H.1987); *see also In re Tech Hifi, Inc.*, 49 B.R. 876, 879 (Bankr. D.Mass.1985).

Again, we note our disagreement with the bankruptcy court's premise that the Denney Block is not a "shopping center" within the meaning of 11 U.S.C. § 365(b)(3). We find that although the bankruptcy court was correct in its reliance on those legal precepts in this context, it was incorrect in finding that on these facts, paragraph 20 of the lease, addressing the right of the parties to terminate the leasehold is not "material or economically significant." That conclusion flies in the face of logic and simple common sense. The average sales provision of the lease is material in the sense that it goes to the very essence of the contract, i.e., the bargained for exchange. This clause, intended to benefit both the landlord and the tenant, was negotiated at arms length to accommodate the commercial expectations of the parties. This average sales provision is also reflective of the economic terms of the lease agreement governing occupancy. However, most importantly, the materiality and economic significance of paragraph 20 turn on the fundamental right to remain in or end a contractual relationship.

We find that the average sales provision of paragraph 20 was not merely inserted as an escape hatch in the event that the location became unprofitable for the protection of the tenant. But rather, that particular clause is of financial import to the landlord in insuring occupancy by high volume sales, viable businesses, thus increasing the rent received under the percentage rent clause. The combination of paragraph 4 and paragraph 20 acts as a minimum income guarantee for the landlord. Certainly nothing could be as material or economically significant to landlords as some minimal assurance that there will be a positive return on their investments. The clause is also significant to landlord as well as the other tenants because customers will be attracted to stores where business is perceived as booming. We conclude, therefore, paragraph 20 is a material and economically significant clause in the leasehold at issue.

### III. CONCLUSION

In conclusion, having satisfied ourselves that we have appellate jurisdiction, we hold that the Denney Block, a contiguous grouping of stores, is subject to the heightened restrictions on the assumption and assignment of leases of real property in shopping centers. *See* 11 U.S.C. § 365(b)(3). We find that the district court erred in affirming the bankruptcy court's approval of the assignment of the leasehold at issue without paragraph 20, an average sales clause, to European Collections. The bankruptcy court did not have authority to excise paragraph 20, a material provision governing the terms of occupancy under the lease. Therefore, we will vacate the judgment of the district court and remand to the district court for further proceedings consistent with this opinion.

SLOVITER, Circuit Judge, dissenting.

I would not reach the majority's plausible view of the merits because I believe that the appeal is moot. I recognize that such a determination may let stand trial court errors, but that inevitable byproduct of an order dismissing an appeal as moot does not relieve us of the compulsion to restrain ourselves when there is no longer a case to decide. Moreover, in this case the majority's decision to ignore the mootness of the appeal overturns a transaction that has long since been consummated involving a non-party, good-faith purchaser. Thus, the requirement that we refrain from deciding this appeal because of mootness is also the better policy because it places the consequences on the party that could have prevented this situation by moving to stay the transaction during the pendency of this appeal.

I am concerned that the decision of the majority to proceed to the merits will undermine the finality of bankruptcy lease assignments, which may lower the value of debtors' estates and thereby reduce the amount available to satisfy creditors. Declining to correct lower court errors, when weighed against this result, is less onerous. *Cf. In re Sax*, 796 F.2d 994, 997–98 (7th Cir.1986) ("At this juncture, it matters not whether the authorization [by the bankruptcy court] was correct or incorrect. The point is that the proper procedures must be followed to challenge an authorization. . . .").

Section 363(m) provides that good-faith purchasers are protected from the reversal of a sale or lease of property on appeal unless there is a stay pending appeal. 11 U.S.C. § 363(m) (1988). Although the assignment of leases is covered by section 365 rather than 363, and thus the language of section 363(m), which governs only "authorization under [363(b) or (c) ] of a sale or lease of property," is inapplicable, some circuits have used section 363(m) to hold that the assignment of a lease is moot as well. *See, e.g., In re Stadium Management Corp.*, 895 F.2d 845 (1st Cir.1990); *In re Exennium*, 715 F.2d 1401 (9th Cir.1983); *see also American Grain Ass'n v. Lee-*

*Vac, Ltd.*, 630 F.2d 245 (5th Cir.1980) (mootness found under Rule 805, predecessor to section 363(m)). I agree with the majority that we should not stretch the language of section 363(m) so far. However, I think well-established rules of justiciability found in the cases of this court and others, along with the particular need for finality in bankruptcy, require that we find the appeal of a completed lease assignment to a non-party moot unless the appellant has sought a stay pending appeal.

This court has long held in non-bankruptcy contexts that challenges to transactions consummated after the approval of a district court are moot if the appellant has not sought a stay of the transaction. In *Brill v. General Indus. Enter.*, 234 F.2d 465 (3d Cir.1956), plaintiff shareholders sought to enjoin the sale of a corporation's assets on the ground that the sale would violate the antitrust laws. The district court refused to grant the injunction, the sale was then consummated, and plaintiffs appealed. We held that the appeal was moot because "[n]o order was sought by the plaintiffs to maintain the existing status pending their appeal." *Id.* at 469. "[W]here the act sought to be restrained has been performed, the appellate courts will deny review on the ground of mootness." *Id.*

Our decision in a bankruptcy case, *In re Cantwell*, 639 F.2d 1050 (3d Cir.1981), relied on *Brill* for the proposition that "where, pending appeal, an act or event sought to be enjoined has been performed or has occurred, an appeal from the denial of the injunction will be dismissed as moot." *Id.* at 1054. We held that because the creditors who sought a stay of the bankrupt's discharge failed to appeal the discharge, an appeal from the district court's order dissolving the stay was moot. We stated, "[g]enerally, an appeal will be dismissed as moot when events occur during the pendency of the appeal which prevent the appellate court from granting any effective relief." *Id.* at 1053; *see also In re Highway Truck Drivers*, 888 F.2d 293 (3d Cir.) (appeal from grant of relief from automatic stay mooted when state supreme court order relieved debtor from liability to

appellants), *cert. denied*, 490 U.S. 1022, 109 S.Ct. 1748, 104 L.Ed.2d 185 (1989).

The majority apparently seeks to distinguish *Cantwell* and *Highway Truck Drivers* on, *inter alia,* the ground that in this case the assignment of the lease did not occur during the pendency of the appeal. *See* Maj.Op. at 1085. Although the precise date of the assignment of the lease to European Collections is not in the appendix, it clearly occurred subsequent to the bankruptcy court's decision. Therefore, there is no basis for the technical distinction the majority seeks to make, and the rationale of *Cantwell* and *Highway Truck Drivers* applies whether the lease assignment occurred during the brief period between the bankruptcy court's order and the appeal to the district court, during the appeal to the district court, or during this appeal.

The majority argues, however, that the assignment of the lease "is not the action appealed from and not the action upon which [it bases its] decision." Maj.Op. at 1086. The majority characterizes the issue before us narrowly as the power of the bankruptcy court to excise paragraph 20 of the lease.

The order from which Denney appeals is the district court's order affirming the bankruptcy court's final order titled "Order Authorizing Trustee's Application to Assume and Assign Lease," which granted the trustee's motion to assume and assign the lease. Although the excision of paragraph 20 is appellant's principal objection to the bankruptcy court's order, his appeal is not so limited. Indeed, in his initial brief appellant states that this case "concerns the assumption and assignment of a lease," and he contends that the Bankruptcy Court "erred in entering its orders authorizing the assumption and assignment of a certain lease over Denney's objections." Appellant's Brief at 4. In response to the appellee's strong argument that the appeal is moot, the appellant, in apparent recognition of the force of that argument, retracted somewhat by arguing that *"[e]ven if* Denny's appeal is moot with respect to the assignment of the lease, it is not moot with respect to the excision of Paragraph 20." Reply Brief at 9 (emphasis added).

Thus, it is misleading to state that "Denney has not challenged the assignment of the lease." Maj.Op. at 1085. The excision was an integral part of the authorization. The bankruptcy court concluded that without excising paragraph 20 "the value of the Lease would obviously be nominal," and that European Collection's offer to pay for the right to obtain the lease "was expressly predicated on its receiving the right to utilize the ... store for at least the remaining four years of the lease," which it would be unlikely to be able to do if it had to meet the terms of paragraph 20 based on the debtor's poor sales record. App. at 227.

Moreover, the practicalities of the situation make clear why the issue of paragraph 20 cannot be divorced from that of the assignment of the lease. Paragraph 20 provides that if annual gross sales for the first six years do not average $711,245, appellant Denny, the landlord, *inter alia,* could terminate the lease. In light of the poor sales by the debtor during its years of operation, the bankruptcy court found that "a new tenant in the Debtor's store would be compelled to generate about $400,000 gross sales by July, 1989" to meet the requirement of paragraph 20. App. at 213. It continued, "[t]he parties all apparently agreed that accomplishing such a volume of sales in this time-frame would be a difficult proposition for any new store." *Id.*

Although the majority asserts that this appeal does not require us to reach the issue of the assignment, Maj.Op. at 1086 n. 2, its decision will undeniably have the effect of fundamentally changing the terms of the assignment and thereby effectively rescinding it. The assignee relied on the excision of paragraph 20 just as it relied on the assignment of the lease in general. Regardless of whether the appellant challenges the power to authorize the lease assignment or challenges the assignment only because it excluded paragraph 20, the appellant had an obligation to seek a stay pending appeal to prevent the substantial reliance of a non-party on the bankruptcy court's final order.

Another ground on which the majority seeks to distinguish *Cantwell* as well as *Highway Truck Drivers* is that in those cases we were unable to review the intervening court decisions that permitted the actions which rendered the appeals moot, and thus we "could not provide effective relief." ·Majority Op. at 1085. This reasoning fails to account for our decision on mootness in *Brill,* a case where we had direct review of the district court decision which permitted the consummated sales transaction that mooted the appeal. In any event, I believe that *Cantwell* and *Highway Truck Drivers* are closer analogs to this case than the majority acknowledges because the only way we can provide relief here is to annul a transaction which involves an entity over which we do not have jurisdiction. The majority cites no cases, and I have found none, in which a consummated sale or assignment to a non-party purchaser has been vitiated on appeal.

Moreover, the majority's position is in stark contrast to the position this court has taken on the necessity of stays to prevent mootness. We stated in *Highway Truck Drivers* that "in addition to those situations covered under 11 U.S.C. § 363(m) and § 364(e), a myriad of circumstances can occur that would necessitate the grant of a stay pending appeal in order to preserve a party's position." 888 F.2d at 298. Those situations are by no means limited to cases in which we could not review intervening court decisions. It is a general principle of law that when a stay is not obtained, the prevailing party may treat the judgment of the district court as final. *Id.* at 297–98. In *Highway Truck Drivers,* 888 F.2d at 298, we quoted at length from *In re Kahihikolo,* 807 F.2d 1540, 1542 (11th Cir.1987) (per curiam), which in turn cited *American Grain Ass'n,* 630 F.2d 245, 247 (5th Cir. 1980), for the proposition that,

> in the absence of a stay, action of a character which cannot be reversed by the court of appeals may be taken in reliance on the lower court's decree. As a result, the court of appeals may become powerless to grant the relief requested by the appellant.

In *Kahihikolo,* the bankruptcy court lifted an automatic stay and thereby permitted a creditor to repossess the debtor's automobile, even though the court had approved the debtor's plan under Chapter 13 under which the creditor would have been repaid in full. The trustee appealed the lifting of the automatic stay, but did not seek to stay the bankruptcy court's decision. The court of appeals ruled the appeal moot because the creditor, after the bankruptcy court's decision, sold the automobile. 807 F.2d at 1541–42.

In *Highway Truck Drivers,* we observed that "[t]here are decisions in other circuits in which events not identified as requiring a stay in the Bankruptcy Code occurred while the automatic stay had been lifted thereby rendering the pending appeal moot." 888 F.2d at 297. Among the cases we cited was *Central States Pension Fund v. Central Transp., Inc.,* 841 F.2d 92 (4th Cir.1988), where an appeal of a reorganization plan was held to be moot because the plan had been substantially implemented and thus reversal "would require undoing financial transactions involving third parties, not participants in this litigation." *Id.* at 96. The court declined to do so when the appellant could have halted implementation of the bankruptcy court decision by obtaining a stay.

The need for finality of transactions involving parties in bankruptcy which underlay these decisions is also the premise behind section 363(m). That section "reflects the salutary policy of affording finality to judgments approving sales in bankruptcy by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids.... The finality and reliability of the judicial sales enhance the value of the assets sold in bankruptcy." *In re Stadium Management Corp.,* 895 F.2d at 847. "This policy concern is implicated not only when property is sold to a third party but also when a lease or option is granted to a third party in reliance on an order of a bankruptcy court." *American Grain Ass'n,* 630 F.2d at 248.

Moreover, the general rule long predates both section 363(m) and its predecessor, Rule 805. As the court noted in *Algeran, Inc. v. Advance Ross Corp.*, 759 F.2d 1421, 1424 (9th Cir.1985), "[t]he rule that failure to obtain a stay pending appeal renders the issue moot did not originate in the Bankruptcy Rules. Rather, it is a judicial doctrine which developed from the general rule that the occurrence of events which prevent an appellate court from granting effective relief renders an appeal moot, and the particular need for finality in orders regarding stays in bankruptcy."

There is no contention that European Collections was not a good faith purchaser in this case. And though it purchased a lease rather than purchased or leased property (which would have put it within section 363(m)), the same policy concerns are equally applicable to lease assignments and to sales or leases of property. Assignment of a lease is, after all, simply the purchase of a right to lease property, albeit not that of the debtor. European Collections paid substantial consideration for that right in reliance on the finality of the bankruptcy court's decision to permit the assignment. It then moved into the premises and established its business, creating the same reliance interest as if it had leased or purchased the property directly from the landlord.

Similar policy considerations may have led to the decisions of those courts holding section 363(m) or its predecessor applicable to lease assignments. *See Stadium Management*, 895 F.2d at 848–49 (holding appeal moot in absence of stay after trustee, with approval of bankruptcy court, sold debtor's stadium pursuant to section 363(b) and assigned debtor's lease for the land underneath it pursuant to section 365); *In re Exennium*, 715 F.2d 1401, 1404 (9th Cir.1983) (assignment of lease could not be voided because appellant had not obtained a stay); *see also American Grain Ass'n*, 630 F.2d at 247–48.

The general principle that appeals are moot in the absence of a stay is broadly applied to bankruptcy orders other than assignment of leases. In *Miami Center Ltd. Partnership v. Bank of New York*, 838 F.2d 1547 (11th Cir.1988), the court stated, "[t]he Eleventh Circuit, like other circuits, has recognized the continuing viability and applicability of the mootness standard in situations other than transfers by a trustee under § 363(b) or (c)." *Id.* at 1553 (citations omitted). The court found the appeal from the confirmation of a liquidation plan was moot even though the transaction was not governed by section 363(m). *Miami Center* relied in part on *Markstein v. Massey Assoc.*, 763 F.2d 1325 (11th Cir.1985), where the court held that it could not rescind a foreclosure sale on the debtor's property, which was permitted after the bankruptcy court lifted an automatic stay on the property because the debtor did not obtain a stay. The sale did not come under section 363(m), but the court nevertheless invoked the "rule of law" that "a court is powerless to rescind the sale on appeal." *Id.* at 1327; *see also In re Sun Valley Ranches, Inc.*, 823 F.2d 1373, 1374–75 (9th Cir.1987) (to the general rule that "the debtor's failure to obtain a stay pending appeal renders an appeal moot after assets ... are sold," the court "carved out a narrow exception ... where real property is sold to a creditor who is a party to the appeal").

In this case, the appellants had the opportunity to seek a stay pursuant to Bankruptcy Rule 8005 and thereby halt the transaction that European Collections justifiably believed was final. The court's decision today will permit the appellant landlord effectively to evict European Collections from the property it has now occupied for several months in reliance on the bankruptcy court's final order. The decision will send a signal to future purchasers of assets from debtors' estates that their purchases may be revoked long after they receive approval by the bankruptcy court and after they have placed substantial reliance on the finality of that approval. That can only have the effect of lowering the value of the debtors' estate. *See Stadium Management*, 895 F.2d at 847; *In re Sax*, 796 F.2d 994, 998 (7th Cir.1986). It also effectively expands this court's jurisdiction beyond its previous limits, because

the court today fashions a remedy which we formerly considered ourselves power-less to compel. Because I believe the ma-jority's decision to overlook the mootness of the issue it reaches is in derogation of our prior precedent and is not consistent with the policy considerations that have informed the Bankruptcy Code and cases here and elsewhere, I respectfully dissent.