**In re SUN TV AND APPLIANCES, INC. and Sun Television and Appliances, Inc., Debtors.**

**Bankruptcy No. 98–2107 (MFW).**

United States Bankruptcy Court, D. Delaware.

May 6, 1999.

Harry Lipman, Susheel Kirpalani, Milbank Tweed Hadley & McCloy, New York City, for debtor.

Laura Davis Jones, Young Conaway Stargatt & Taylor, Wilmington, DE, Co–Counsel for debtor.

Brett Miller, Otterbourg Steindler Houston & Rosen, PC, New York City, for Official Committee of Unsecured Creditors.

David B. Stratton, Pepper Hamilton, LLP, Wilmington, DE, Co–Counsel for Official Committee of Unsecured Creditors.

Robert J. Dehney, Morris Nichols Arsht & Tunnel, Wilmington, DE, for Hilco/Klaff.

Charles M. Oberly, III, Oberly & Jennings, P.A., Wilmington, DE, for Huntington Mall Company.

John D. McLaughlin, Office of U.S. Trustee, Philadelphia, PA.

## OPINION[1]

MARY F. WALRATH, Bankruptcy Judge.

### I. INTRODUCTION

This case is before us on the Motion of Sun TV and Appliances, Inc. ("the Debtor")[2] for approval of the assumption and assignment of a ground lease of an outparcel ("the Lease") at the Huntington Mall Shopping Center in Barboursville, West Virginia, to Hilco/Great American Real Estate Services, LLC and Klaff Realty LP ("Hilco/Klaff"). The Huntington Mall Company ("the Landlord") opposes that Motion because that Motion provides

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

2. Both Sun TV and Appliances, Inc. and Sun Television and Appliances, Inc. filed the Motion. However, only the latter was a party to the lease which is the subject of this Opinion.

that the assumption and assignment is contingent on a finding that the Lease is not subject to the heightened restrictions of section 365(b)(3) which are applicable to shopping center leases. Because we find that the Lease is a shopping center lease subject to the requirements of section 365(b)(3), we deny the Motion as it pertains to that lease.

## II. PROCEDURAL POSTURE

On December 21, 1998, the Debtor filed a Motion Under 11 U.S.C. §§ 105, 363 and 365 for Order (i) Authorizing and Approving Procedure for Assumption and Assignment by SUN TV, to Highest and/or Best Bidder(s) of Unexpired Leases of Nonresidential Real Property, (ii) Extending Time to Assume or Reject Such Leases, and (iii) Scheduling Further Hearing to Approve Results of Auction and Authorize Assumption and Assignment of Leases, which we approved on December 30, 1998. Pursuant to that Motion, the Debtor conducted an auction on January 6, 1999, where Hilco/Klaff submitted the highest and best bid for two of the Debtor's leases: Beckley, West Virginia and the Huntington Mall lease at Barboursville, West Virginia. The Motion was granted with respect to the Beckley lease; however, that part of the Motion relating to the Huntington Mall lease requires a determination by this Court whether the Demised Premises are part of a shopping center and subject to section 365(b)(3). This determination is the subject of this Opinion.

The sale here is not a straight assumption and assignment of the Lease. Rather, the Debtor seeks to assign its right to assign the Lease to Hilco/Klaff for a period of 90 days after the entry of a final order on the Landlord's objection. During this period, Hilco/Klaff intends to shop the Lease and direct the Debtor to file a motion to assign the Lease to a party chosen by Hilco/Klaff. In order to be able to freely shop the Lease, Hilco/Klaff requires a finding that the Lease is not subject to the provisions of section 365(b)(3).

## III. DISCUSSION

In order to assume and assign a lease or executory contract, a debtor typically need only cure any arrearages and provide adequate assurance of future performance of the lease or contract. 11 U.S.C. § 365(b)(1). In the case of shopping center leases, however, Congress has placed additional restrictions on the right to assume and assign. Section 365(b)(3) provides:

(3) For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

(A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

(B) that any percentage rent due under such lease will not decline substantially;

(C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3).

In order to determine if the additional restrictions contained in section 365(b)(3)

apply to the Lease, we must determine if that Lease is a shopping center lease. The parties apparently agree that the Huntington Mall Shopping Center is a shopping center within the meaning of section 365(b)(3); however, they disagree over the boundaries of that shopping center. The Debtor asserts that the shopping center only includes the enclosed mall portion of the premises and does not include the out-parcels. The Landlord asserts that the shopping center goes beyond the enclosed mall and includes the out-parcels, one of which is the parcel leased to the Debtor ("the Demised Premises").

■ The Third Circuit Court of Appeals has provided us guidance on what factors to consider in determining whether a lease falls within the confines of section 365(b)(3). *See In re Joshua Slocum Ltd.,* 922 F.2d 1081 (3d Cir.1990). The Third Circuit stated in *Joshua Slocum:*

> While it is true that the mall *is* the archetypal "shopping center," all shopping centers do not necessarily take the form of shopping malls.

> Location is only one element in the determination of whether a group of stores can properly be described as a "shopping center." However, more significant are the following criteria sketched in Collier [on Bankruptcy], [*In re] Goldblatt [Bros., Inc.,* 766 F.2d 1136 (7th Cir.1985)] and [*In re] 905 Int'l [Stores, Inc.,* 57 B.R. 786 (E.D.Mo. 1985)]:

> (a) A combination of leases;

> (b) All leases held by a single landlord;

> (c) All tenants engaged in the commercial retail distribution of goods;

> (d) The presence of a common parking area;

> (e) The purposeful development of the premises as a shopping center;

> (f) The existence of a master lease;

> (g) The existence of fixed hours during which all stores are open;

> (h) The existence of joint advertising;

> (j) [sic] Contractual interdependence of the tenants as evidenced by restrictive use provisions in their leases;

> (k) The existence of percentage rent provisions in the leases;

> (*l*) The right of the tenants to terminate their leases if the anchor tenant terminates its lease;

> (m) Joint participation by tenants in trash removal and other maintenance;

> (n) The existence of a tenant mix; and

> (o) The contiguity of the stores.

*Id.* at 1087–88 (emphasis in original).

■ We, therefore, address each of the *Joshua Slocum* factors as they may apply in this case.

### A. A Combination of Leases

In this case, there are a combination of leases for the enclosed mall and for the out-parcels. However, some of the stores have typical leases, some of the parcels (particularly the out-parcels) are leased under ground leases, and some are conveyed but subject to a Reciprocal Easement Agreement ("REA"). (Exhibits H–2, H–14, S–1, S–3 & S–7.) The Debtor, however, does not argue that the different forms of agreement are significant and, in fact, concedes that this factor is met. (Debtor's Letter Brief dated March 22, 1999, at p. 3, n. 5.)

We agree. We do not find it significant that the "leases" of the various stores at the Huntington Mall and environs are designated leases, ground leases or reciprocal easement agreements. We are satisfied that each type of agreement provides the "tenant" and the Landlord with similar respective interests in the premises, regardless of which type of agreement is used. Specifically, they give the Landlord and the "tenant" the rights typical of a landlord and tenant at a shopping center, at least with respect to the areas of inquiry relevant under *Joshua Slocum.* Therefore, we find that the first factor is met.

B. *All Leases Held by Single Landlord*

In this case, all of the leases (typical leases, ground leases and REAs) are held by a single landlord. The Landlord is the landlord for all the leases in the enclosed mall, as well as all of the out-parcels. The Debtor concedes this point. (Debtor's Letter Brief dated March 22, 1999, at p. 3, n. 5.)

C. *All Tenants Are Commercial Retail Distributors*

The Landlord summarily asserts that "[n]early all ... are engaged in retail operations or services related to retail operations." (Landlord's Letter Brief dated March 22, 1999, at p. 4.) The Debtor disputes this, noting that "[t]he Landlord's tenants include restaurants, a bank, a market research firm, a travel agent, a provider of medical services, a movie theater, and a hotel." (Debtor's Letter Brief at p. 3, n. 5, citing Exhibit H–14 at Exhibit C.)

We do not find the presence of those non-retail establishments to be determinative. We note from the site plan that most of the non-retail establishments cited by the Debtor are located within the enclosed mall (*i.e.* the cinema, numerous restaurants, banks, and the medical center). (Exhibit H–14 at Exhibit C.) The Debtor does not argue that the presence of these non-retail establishments means that the enclosed mall area is not a shopping center.

The Landlord argues, and we agree, that those types of establishments are typically in malls as a convenience (and attraction) for shoppers. For example, the presence of restaurants whether in an enclosed mall or at out-parcels around the mall, are magnets for customers to the mall. Likewise, the presence of the mall is an attraction for the diners at these restaurants. Similarly, the banks and automatic teller machines are necessary for the support of the retail stores in the mall, although they are not retail establishments themselves. They clearly have the symbiotic relationship with the retail tenants and

each other that the Third Circuit found necessary to create a shopping center. *Joshua Slocum,* 922 F.2d at 1089 (quoting H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 348 (1977).)

D. *The Presence of a Common Parking Area*

This factor is hotly disputed by the parties. The Debtor asserts that this is a critical factor, citing *Joshua Slocum,* 922 F.2d at 1088; *905 Int'l,* 57 B.R. at 789; and a law review article as authority. In this case, the Lease is of an out-parcel which is physically separated from the rest of the mall area by the Outer Ring Road. The mall parking is extensive within the Outer Ring Road and that parking area is not identified with any one mall tenant but is clearly available to all mall shoppers. In contrast, the leased premises contains its own parking area next to the Debtor's own building, which parking lot is separated from the mall parking by the Outer Ring Road.

The Debtor cites several factors which it believes mandate a finding that there is no parking area common to the Demised Premises and the enclosed mall. First, the Debtor contends that it is not obligated under its Lease to pay for maintenance of the common parking area, but only for its own, citing Exhibit H–2 at ¶ 12(B). This contrasts with the other tenants whose leases require that the Landlord maintain the common parking area, for which the tenants pay their share. (Exhibits S–3 & H–14 at ¶ 11.) The Lease belies this contention. Paragraph 53 of the lease *does* obligate the Debtor to pay $3,000 per year "as a contribution toward Landlord's cost of maintaining the common areas and access roads leading to the Demised Premises." (Exhibit H–2 at ¶ 53.) Thus, the Debtor is required to contribute to the common areas, including the parking area.

Further, the Lease does provide expressly that the Debtor's parking area is available to other tenants of the mall and

their customers: Paragraph 1 of the Lease expressly states that "Landlord excepts and reserves unto Landlord and all others to whom Landlord has or may hereafter grant rights, the right to use the parking and cruising lane area of the Demised Premises as it from time to time appears for vehicular ingress and egress and pedestrian ingress and egress, and the sidewalk and landscaped area for pedestrian ingress and egress." (*Id.* at ¶ 1.) Further, the Lease expressly prohibits the Debtor from constructing any barriers to those areas: "said areas to be kept open at all times for the use of Landlord and all others to whom Landlord has or hereafter may grant rights ..." (*Id.* at ¶ 11.) Conversely, the Landlord agreed "that no barrier will be erected in the areas designated [which included the common parking areas] which will deny the Tenant, its customers and invitees, access to Huntington Mall and the nearest right-of-way." (*Id.* at ¶ 53.)

The Debtor argues that these provisions only gave the Landlord and others the right to pass through the Debtor's Premises, emphasizing the "ingress" and "egress" language of the above quoted provisions. We disagree. The use of the terms ingress and egress do not suggest a mere pass through, but clearly contemplate also that the driver or pedestrian will drive onto the property, remain there for a time (*i.e.* park in the parking lot), and leave the property. This is confirmed by the plot plan (Exhibit H–1) which demonstrates that, because of the location of the Demised Premises, customers would not be passing through that parking lot to go anywhere (with the possible exception of Logan's Restaurant) [3]; the Demised Premises are at the edge of the mall property.

Second, the Debtor argues that the other tenants' leases provide that the Landlord can restrict where their employees park, while the Lease does not. (Exhibit H–2 at ¶ 8; Exhibits S–3 & H–14 at ¶ 7.)

However, the Landlord's agent testified that such restrictions have never been imposed on any tenant. Thus, the reservation of a right to do so is not significant in our opinion.

Third, the Debtor points to a provision in another tenant's lease (Phar–Mor) which defines the parking area of the "Shopping Center" as only the area within the Outer Ring Road (for purposes of its right to terminate its lease if more than 10% is condemned). (Exhibit S–3 at ¶ 22(C).) However, that lease was executed in July of 1989, while the Lease is dated July 1996. At the time the Phar–Mor lease was drafted, the Landlord did not even own the property which is the subject of the Lease. The Landlord did not exercise its option to purchase the land where Debtor is located until 1995 and the store and parking lot were not constructed until 1996. Thus, at the time of the Phar–Mor lease there was no parking area of the Debtor's. We, therefore, do not find that provision to be relevant.

Altogether, we find that the provisions of the Debtor's lease did contemplate that the parking lot on the Demised premises was available for all customers of the mall and that the Debtor's customers were free to park in the parking area closer to the enclosed mall. Thus, we find that the fourth factor in *Joshua Slocum* (a common parking area) is met here.

### E. *Purposeful Development as a Shopping Center*

The Debtor asserts, as fatal to the Landlord's case, the fact that the Debtor's parcel was not part of the original development of the Huntington Mall. The Debtor emphasizes that the Landlord did not even own the Demised Premises at the time the mall was developed and did not buy it until some fifteen years later. The Debtor, therefore, asserts that the entire Huntington Mall was not one purposeful develop-

---

**3.** The Debtor admits that there is a separate express provision giving the Logan's custom-

ers the right to park in the Debtor's parking lot. (*Id.* at ¶ 58.)

ment at one time, but rather a sporadic design over twenty-five years. The Debtor emphasizes that the original "plan" is evidenced by the REA whereby the Landlord and the three anchor tenants defined the shopping center to be developed as only the enclosed mall. (Exhibit S–1 at ¶ 1 & Exhibit B.)

The Landlord counters that the mall was planned as an ongoing process with several phases. In particular, the Landlord asserts that the Demised Premises were always contemplated to be part of the mall; they were simply developed at a later phase. The Landlord presented evidence that it obtained an option to purchase the Demised Premises in 1974, the same time that it bought the land on which the enclosed mall stands. That option was amended in 1978 to a right of first refusal. (Exhibit S–2.) The Landlord's agent also testified that, when the Landlord began to develop the enclosed mall in the 1970's, it included the property subject to the right of first refusal in estimating traffic flow and water and sewer capacity. (N.T. 1 at 19–21, 90, 146–47.)[4] Thus, the Landlord's plans to eventually develop the Sun parcel, albeit prospective in nature, were a factor in the earliest phases of development dating back 20 years to the construction of the enclosed mall. The Landlord asserts that this shows a common development scheme which always included the Debtor's lot.

The Debtor counters that the right of first refusal had no time limit and, therefore, the owner was not obligated to sell the property to the Landlord at any time. Therefore, the Landlord could not have proceeded with its development according to any common scheme. Further, the right of first refusal was only available if the owner decided to sell the property; the owner was free to develop the land itself (as a cemetery or a commercial venture). Thus, the Debtor argues that the development of the Demised Premises was not part of a common development scheme but was piecemeal at best.

However, the Debtor fails to note that the right of first refusal specifically restricted the owner from developing that parcel "for retail stores, restaurants, sale of food for on or off site consumption, banks or other financial institutions, or other retail or commercial services such as generally located in a shopping center, without the written consent" of the Landlord. (Exhibit S–2 at ¶ 2.) The Landlord also notes that, while it was theoretically possible that the owner could develop the Demised Premises for commercial use without selling it to the Landlord, that was practically impossible. This is because the land was significantly below the grade of the adjoining mall property; to access and use it, a considerable amount of fill had to be added first. The Landlord had the fill readily available (and at no cost) from leveling the rest of the mall property; in contrast, the property owner would have had to pay to haul in fill if it intended to develop that land commercially.

The Landlord argues that everything worked out just as it had planned in the early 1970's: the Landlord did in fact acquire the property subject to the right of first refusal from the owner and did lease part of it to the Debtor to build a store.

The Landlord points to the physical design and layout of the mall as further evidence of the common development. The shopping center is laid out in concentric circles with the enclosed mall at the center surrounded by the Inner Ring Road, the parking lot, the Outer Ring Road and the out-parcels. All the buildings, including the Debtor's are constructed of similar materials, particularly in appearance, and the parking and other lights are the same. (Exhibit H–2 at Exhibit C, ¶¶ B1, C2 & E.) The Landlord's agent also testified that the Landlord had re-

---

4. This matter was heard on March 11 and March 15, 1999. Citations to the transcripts of the March 11 and March 15 testimony are indicated by "N.T. 1" and "N.T. 2" respectively.

quired that the Debtor change its original designs to be consistent with the rest of the mall, particularly with respect to the exterior material. The Debtor complied with this request.

The Landlord argues that the timing of the development of the phases of the mall is irrelevant, because the evidence demonstrates that the mall (including the Debtor's lot) was developed as a common project, with a common design and purpose. Alternatively the Landlord argues that the Demised Premises are part of a smaller shopping center consisting of the Debtor, Lowe's and Logan's Restaurant, since those three properties were developed at the same time (and were covered by the right of first refusal).

We conclude on the evidence before us that the Demised Premises were part of a development of the Huntington Mall, although not added until some years later. The inclusion of that parcel in an option (and later right of first refusal) demonstrates that the Landlord contemplated developing that parcel as part of the shopping center from the very beginning. The fact that events transpired as the Landlord contemplated supports that conclusion. While not all development of contiguous parcels at different times can be deemed to be a common development of a shopping center, we conclude that in this case there is substantial external evidence that this occurred.

The Landlord's actions over twenty five years are consistent with this scheme. Its layout of the mall, the mall entrance, the Ring Roads and the grading of the mall all made it virtually impossible for anyone else to develop the Demised Premises. When the Landlord did acquire the property, it required the construction of the buildings to be architecturally consistent with the rest of the mall buildings.

We conclude the Demised Premises and the Huntington Mall were developed with a common purpose: the creation of a shopping center. This criteria is met here.

## F. Master Lease

■ The existence of a master lease, which memorializes the interrelationship among the tenants and the landlord, is a "typical" indicator of a shopping center. *See Goldblatt,* 766 F.2d at 1141; *905 Int'l,* 57 B.R. at 789.

In this case we find there is no master lease. The Landlord asserts that the REA is "equivalent" to a master lease, because all tenants including the Debtor are subject to that document. (*See, e.g.,* Exhibit H–2 at ¶ 28.) However, the REA merely provides guidelines for construction and easements, it does not provide standard lease terms which all tenants must observe or which in any other manner bind the tenants together. Further, the Landlord acknowledged that each lease at the mall was separately negotiated and contained different terms (relating to, *inter alia,* percentage rent, advertising, and store hours).

■ Thus, we conclude that there was not a "master lease" at the mall and this factor is not met here. However, this factor is not dispositive. In the *Joshua Slocum* case this factor was also missing. The Court of Appeals in *Joshua Slocum* noted that the legislative history to section 365(b)(3) stated only that "[a] shopping center is ... *often* subject to a master lease or financing agreement." 922 F.2d at 1089 (quoting H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 348 (1977)) (emphasis in original). The Court of Appeals concluded that "[t]he use of the term 'often' in the above quoted passage indicates that the existence of a master lease should not be determinative in this court's analysis." *Id.* at 1089. Similarly, we conclude that the absence of a master lease in this case is not fatal to the Landlord's argument.

## G. Fixed Hours During Which All Stores Are Open

■ It is typical of shopping center leases to require that all stores are open during the same hours. Such a term demonstrates the interdependence of the

stores. In this case, the Debtor's lease did not require that the store remain open during the mall hours; instead it simply required that the store remain open "during the same days, nights and hours as a majority of [the Debtor's] other [stores] are open and doing business in the States of Ohio, West Virginia and Pennsylvania." (Exhibit H–2 at ¶ 6.) There was no evidence presented as to any relationship between the mall hours and the Debtor's other stores' hours. In addition, that provision was applicable only to the first three years of the lease; there is no requirement concerning hours of operation for the remainder of the lease. (*Id.*) Further, the Lease allows the Debtor to close the store for up to 359 consecutive days without giving the Landlord the right to terminate the Lease. (*Id.*) Clearly, all these provisions together do not meet the "fixed hours of operation" factor in *Joshua Slocum.*

The Landlord argues, however, that anchors and mini-anchors are not typically required to be open at set hours. Instead, it is more typical to require the smaller tenants to stay open during the hours that the anchors are open. If the latter is true, though, we cannot believe that the Landlord would not insist on a clause in the anchor stores' leases requiring that they be open for some number of hours (even at times they may set). Otherwise, the Landlord would have no control over any of the stores: if the anchors did not open, the other stores need not be open, and the Landlord would lose all percentage rent entitlements and have a closed mall.

The Landlord also notes that even though the Lease does not have a "fixed hours of operation" clause, that Lease does require that the Debtor keep the parking lights on during the mall hours. While this supports our finding that there is common parking between the Debtor and the mall, *see* Part D above, it does nothing to support a finding that there were fixed hours of operation. We, therefore, conclude that this factor has not been met in this case.

## H. *Joint Advertising*

The Debtor argues that this factor too is missing. The Debtor is not obligated by its Lease to contribute to the joint marketing fund as many of the enclosed mall tenants are. In fact, this provision in the standard lease form is "Intentionally deleted" in the Lease. (Exhibit H–1 at ¶ 32.)

While the Landlord concedes this fact, it asks us to take a broader view of the "joint advertising" criteria. The Landlord's agent testified that none of the anchor or mini-anchor tenants are required to contribute to the joint advertising fund because the Landlord knows that those large tenants (often regional or national chains) will advertise heavily on their own. Thus, the Landlord asserts there is no reason to require that the anchors advertise with the other tenants, as there are no economies of scale to be offered by contributing to a joint fund. Further, the Landlord notes that the anchors do mention the mall in their advertising, thus contributing to the "joint advertising" effort of the other tenants. (Exhibits H–7, H–8, H–9, H–10 and H–11.) In fact, the Debtor's own ads prominently note its address at the Huntington Mall. (Exhibit H–11.)

The Debtor counters that these ads demonstrate that there was no joint advertising effort as they all advertise only one tenant. We disagree. The prominent use in all the ads of the Huntington Mall name demonstrates an effort by the Debtor and the other tenants to be associated with each other in the customers' minds. As the Landlord noted, the individual advertising by the anchors, including the Debtor, did inure to the benefit of all the tenants by attracting more customers to the mall.

The Landlord also points to other forms of joint advertising in which the Debtor did participate: the mall gift certificate program allows customers to buy one gift certificate usable at any mall store, includ-

ing the Debtor's. (Exhibit H–6.) Further, the Landlord's agent testified that it provides directories in the mall that list the tenants' stores, including the Debtor's. Finally, the Debtor did share two signs with another tenant at the mall (Logan's Restaurant, which is adjacent to the Demised Premises). (Exhibits H–3, H–4, & H–5.)

■ The Debtor asserts, however, that none of that advertising counts since "joint advertising" is commonly understood to mean "print and media advertising." We agree with the Landlord that the term advertising should not be interpreted so narrowly; there is no basis in the Code or *Joshua Slocum* to suggest that we should limit that term as the Debtor argues.

Based on an overall view of the advertising done by the Debtor and the other tenants at the mall, we find that there was joint advertising, in signage, in joint gift certificate programs and in the prominent use of the mall name in the print ads run by the Debtor and other tenants.

### I. *Restrictive Use Provisions*

The Lease does contain a restrictive use provision that limits the use of the Demised Premises, during the first fifteen years of the Lease, to the sale of "televisions, electronics, home appliances, computers and home office products and all related products." (Exhibit H–2 at ¶ 6.) While the Debtor's use provisions were less restrictive during any extension period of the Lease, it was still prohibited from duplicating the use of certain other identified stores in the mall or from using the Leased Premises in a way that would violate any restrictive covenant in certain other leases of the mall. (*Id.*) Further, the Lease specifically prohibited the use of the Demised Premises for "a traditional, conventional or discount department store" or "the operation of a bookstore, jewelry store, or for the operation of a store whose primary business is the retail sale and display of blank and pre-recorded music, video, multimedia software in the form of

audio tape, compact discs, cassette tapes, or video discs, and record cassettes" or for the types of uses specifically delineated in the Lease between the Landlord and Lowe's Home Centers, Inc., which was incorporated into the Lease as Exhibit D. (*Id.*) The Debtor specifically acknowledged in the Lease that the restrictive use provision was "a material consideration to Landlord." (*Id.*) The Landlord's agent testified that there were similar restrictive use covenants in "99.9 percent" of the leases at the Huntington Mall. (N.T. 1 at 62.) In fact, the Debtor's own chart (relating to only *some* of the mall tenants) showed that every lease its witness reviewed contained such provisions. (Exhibit S–8.)

While the Debtor acknowledges the restrictive use provision, it asserts that what is required is an "exclusive use" provision, which would guarantee to the Debtor the exclusive right to sell certain products. It points to the Phar–Mor lease which does contain such a provision as being what is required. (Exhibit S–3 at ¶ 11 & Exhibit C.)

We disagree with the Debtor's legal thesis. *Joshua Slocum* does not require exclusive use provisions in every lease; it requires that the leases contain complementary restrictive use provisions such that it is clear that the various tenants are bound to provide a complementary and diverse array of products and services, which together will attract a large number of customers to the shopping center. *See Joshua Slocum,* 922 F.2d at 1088–89. The restrictive use provisions in the Lease, together with the testimony that every other lease at the mall contains similar provisions, clearly demonstrate the interdependence of the tenants and a scheme to maintain a mix of tenants providing different services and products.

■ Further, while the purpose of restrictive use provisions is to benefit all of the tenants and the Landlord by attempting to achieve an optimum tenant mix, the purpose of an exclusive use provision is to

provide protection to a single tenant. That is, an exclusive use provision does not serve to enhance tenant interdependence. Accordingly, we find that an exclusive use provision is not necessary to achieve the contractual interdependence discussed in *Joshua Slocum*.[5]

Additionally, as noted above, the Landlord testified that an exclusive use provision does not work with electronics stores. To attract customers to electronics and appliance stores, the Landlord believes that it is necessary to have at least two such stores at the mall to permit comparison shopping. Thus, the Landlord asserts that there must be an electronics/appliance store at the Debtor's site to provide comparison shopping for customers at Circuit City (which also has a store on an outparcel at the Huntington Mall). The restrictive use provisions of the Lease are designed to achieve that goal.

The Debtor counters this argument by noting that the mall has a Sears store which also sells appliances and electronics. This, the Debtor argues, should provide the Landlord with the mix it seeks.

We conclude that the Landlord has presented enough evidence of the need for the use restriction and its effect on the existing tenant mix to convince us that the elimination of the clause may have an adverse effect on the volume of shoppers at the mall. The fact that the mall is in a rural area far from other shopping options convinces us that, in the absence of a competitor for comparison shopping in that mall, consumers may go elsewhere where there is the ability to check the prices and models at two or three stores. The items sold at the Debtor's store are big, relatively high priced goods. Consumers are not likely to buy them without comparison shopping. Further, while Sears may provide that comparison, we believe that (in a mall of 150 stores), the Landlord (and its tenants) have the right to insist on three stores selling these types of items to assure sufficient traffic. Such is the tenant mix for which the Landlord (and its other tenants) bargained. Therefore, we conclude that the restrictive use requirement has been met here.

## J. Percentage Rent Provisions

The Lease did not provide for payment of percentage rent. (Exhibit H–2 at ¶ 5.) The majority of the other tenants' leases do, however, contain percentage rent clauses. (N.T. 1 at p. 77.) The Debtor argues that percentage rent clauses are "hallmarks of shopping centers." (Debtor's Letter Brief dated March 22, 1999, at p. 17, citing *905 Int'l*, 57 B.R. at 788.) The Debtor asserts that the fact that the Lease has no percentage rent clause, while other leases do, demonstrates that the Demised Premises are not part of the "shopping center."

The Landlord asserts, however, that neither Congress nor the Third Circuit required that all leases in a shopping center have percentage rent clauses. The *Joshua Slocum* court, citing the legislative history of section 365(b)(3) stated:

> [T]he tenant mix in a shopping center may be as important to the lessor as the actual promised rental payments, because certain mixes will attract higher patronage of the stores in the center, and thus, a higher rental for the landlord from *those stores that are subject to a percentage of gross receipts rental agreement.*

---

5. To accept the Debtor's contention that an exclusive use provision is a requisite to a finding that a given location is a shopping center would invite absurd results. For instance, the Debtor's witness presented a chart that summarized the characteristics of fifteen other leases at the Huntington Mall (Exhibit S–8.) All fifteen leases are for stores in the enclosed mall. While all fifteen contain restrictive use provisions, only 2 leases contain exclusive. If an "individualized approach to exclusive use clauses" bars a finding that an area is a shopping center, then the enclosed mall in this case would not qualify as such. We decline to adopt a rationale which might lead to such clearly absurd results.

*Joshua Slocum,* 922 F.2d at 1089 (emphasis added).

The Landlord's agent testified that typically anchor stores (and mini-anchors like the Debtor) are not required to pay percentage rent because they are the "draws" to the mall, benefitting the other tenants by attracting patrons to the mall and benefitting the Landlord because of the percentage rent clauses in the smaller tenants' leases.

■ We agree with the Landlord that neither the *Joshua Slocum* decision, nor Congress, required that all leases in a shopping center contain percentage rent clauses. Rather, the *Joshua Slocum* court held that the existence of percentage rent clauses in the leases was an indicia of a shopping center. Here we find such an indicia in the fact that most of the small tenants at the Huntington Mall had percentage rent clauses, while most of the anchors' and mini-anchors' leases did not. The Landlord has articulated a business reason for not including such clauses in the leases of the anchors and mini-anchors, which is not inconsistent with the existence of a shopping center. Thus, we find that this factor has been met here.

### K. *Right To Terminate if Anchor Tenant Terminates*

The Debtor's lease does not contain a provision allowing it to terminate its lease if the anchors leave. No evidence was presented that any of the tenants may terminate their leases if the Debtor leaves. Some of the other leases do, however, contain clauses which allow them to terminate their lease or pay reduced rent if there is a certain percentage of vacancies at the mall. (Exhibit H–14.)

The Debtor argues that this lack of "co-tenancy" provisions demonstrates the lack

of interdependency between the Debtor and the other tenants of the Huntington Mall, thereby resulting in the conclusion that the Debtor is not part of the shopping center. The Landlord argues that each lease is different in this regard, depending on what the tenant's interests and negotiating strengths were.

We agree with the Debtor that this element has not been met. The lack of symbiotic co-tenancy clauses may demonstrate that the tenants do not feel sufficiently part of the same shopping center. However, we do not believe that this element alone is significant in this case.[6]

### L. *Joint Trash Removal and Other Maintenance*

The Lease requires that the Debtor dispose of all of its trash "in accordance with regulations reasonably established by Landlord, use and pay for the services of the designated trash hauler of the Landlord...." (Exhibit H–2 at ¶ 7(A)(4).) The Landlord's agent testified that all of the leases at the Huntington Mall had similar provisions. (N.T. 1 at 70–71.)

In addition, the Lease does contain provisions for contribution to the maintenance of the common areas, as well as its own. The Lease requires, as noted above, the contribution by the Debtor of $3,000 per year "toward Landlord's cost of maintaining the common areas and access roads leading to the Demised Premises." (Exhibit H–2 at ¶ 53.) By contrast, the other leases require contribution for maintenance of common areas which are described much more broadly. (Exhibit H–14 at ¶ 11(A) & (D).) The Debtor asserts that its Lease provision applies only to the maintenance of the common areas leading to the Demised Premises, because it is in the provision entitled "No–Barrier Agree-

---

6. One possible explanation for the lack of a cohesive pattern of co-tenancy clauses at the Huntington Mall may simply be the size of the mall. There are over 150 tenants at the mall. The constant change of tenants and types of stores may make it difficult to retain the same type of co-tenancy language in the leases (particularly language that identifies a specific tenant). Given the ever increasing sizes of shopping centers today, we do not give much weight to the lack of this factor.

ment" and is expressly in consideration for the Landlord's agreement not to construct any barriers between the mall and the Debtor's parking lot. While this is so, there is no restriction on the Landlord's use of the funds paid to common areas near the Demised Property. Instead the provision allows the Landlord to use the funds for the maintenance of all common areas.

Further, the Debtor's argument—that it wanted to assure that there was no barrier between it and the rest of the mall—contradicts its argument that the Demised Premises were distinct and separate from, not part of, the shopping center.

Based on the above provisions, we conclude that this factor has been met in this case.

## M. *Tenant Mix*

The Debtor asserts that the Landlord has provided little evidence that the use restriction clause in the Lease was meant to maintain a specific tenant mix at the Huntington Mall. For the reasons stated in Part I "Restrictive Use Provisions" above, we disagree.

## N. *Contiguity of Stores*

The Debtor asserts that there is no contiguity between the Demised Premises and the other stores at the mall. To support its position, the Debtor points to the fact that the Demised Premises are on an outparcel separated from the enclosed mall by a four lane road (the Outer Ring Road) and the mall parking lot. This is even more compelling, the Debtor asserts, because the Debtor's property is separated from the Outer Ring Road by a guardrail and there are no pedestrian crossings or sidewalks to the mall. However, the photos of the mall show clearly that the guardrails were only in certain areas (where the traffic merged or crossed) and did not enclose the Demised Premises entirely. (Exhibit H–3 & H–4.) In fact, as noted above, the Landlord expressly agreed not to construct barriers between the Demised

Premises and the Mall. (Exhibit H–2 at ¶ 53.)

The Landlord asserts that there is contiguity because all the property, from the Demised Premises to the enclosed mall is one contiguous area consisting of the shopping center—there is no public roadway or other private property between the two. In response to the Debtor's assertion that there was no expectation that pedestrians would cross the Outer Ring Road (as evidenced by the lack of crossing areas and traffic lights), the Landlord's agent testified that the Outer Ring Road and the Inner Ring Road had the same provisions for pedestrian travel: 10 mile per hour speed limits. (N.T. 1 at 113 & 150.) Clearly, pedestrians cross the Inner Ring Road to get to the enclosed mall, and the Landlord asserts they cross the Outer Ring Road to get to the Demised Premises as well.

There was considerable testimony about distances from the out-parcels to the enclosed mall. The Debtor tried to demonstrate that it is unlikely that customers will park in the Debtor's parking lot and walk to the enclosed mall, or to Circuit City (another out-parcel) to comparison shop. The Landlord demonstrated that the Debtor's lot was closer to the enclosed mall than other out-parcels. This is largely irrelevant, we believe. None of the out-parcels at the Huntington Mall are so far away that a customer could not walk to them. Obviously, to the extent that there is free parking, a customer will park as close to the ultimate destination as possible. Thus, to the extent a customer is looking for a television or other appliance, he or she is likely to park in the Debtor's (or Circuit City's) parking area and then drive to the other's parking area for comparison shopping. Then the customer will either walk (or drive) to the enclosed mall to finish shopping. This does not eliminate the contiguity of the area.

We agree with the Landlord that the entire Huntington Mall is one contiguous

shopping center, subject to common ownership and a common purpose (to provide a mix of retail stores designed to attract numerous customers for all their shopping needs). The fact that the mall is large, and thus not conducive to walking from the out-parcels to the enclosed mall, is not fatal. There are many enclosed malls which are so large that customers typically move their cars from one end to the other to finish their shopping. This does not destroy the contiguity nor mean that the customer does not view the entire area as one shopping center. We find that there is contiguity in this case.

This conclusion is supported by the facts of *Joshua Slocum*. In that case, the Third Circuit found contiguity although the shopping center consisted of three separate buildings with a courtyard between them. *Joshua Slocum*, 922 F.2d at 1089. The Third Circuit stated: "We also note that a 'single unit' as described [in the Legislative History] does not have to be an enclosed mall as the bankruptcy court would have it, but rather could be properly conceived of as a cluster of three relatively contiguous buildings" as in that case. *Id.* Here, as in *Joshua Slocum*, "[a]ll of the stores, except to the extent that they are separated by common areas, are contiguous." *Id.* at 1088. In this case, the enclosed mall, with out-parcels separated only by the common parking area, is even more typical of a shopping center than the *Joshua Slocum* case. We find that the contiguity factor is met.

Considering all the *Joshua Slocum* factors, we conclude that the Debtor's Demised Premises are part of the Huntington Mall and a shopping center within the meaning of section 365(b)(3).

## IV. *ANTI–ASSIGNMENT CLAUSE*

▮ The Debtor asserts that, notwithstanding a finding that the Demised Premises are part of a shopping center, that we may strike the use restrictions of the Lease because they constitute a de facto anti-assignment clause. The Debtor also

notes that the Third Circuit in *Joshua Slocum* acknowledged that "[e]ven under the tightly drawn definition of 'adequate assurance' in the shopping center context, Congress did not envision literal compliance with all lease provisions." *Joshua Slocum*, 922 F.2d at 1090. However, the Debtor stopped the quote too soon; the Third Circuit finished that sentence with: "insubstantial disruptions in, *inter alia*, tenant mix, and insubstantial breaches in other leases or agreements were contemplated and allowed." *Id.* at 1090.

We note that section 365(b)(3)(C) expressly includes adherence to use provisions and preservation of tenant mix as necessary elements of "adequate assurance of future performance of a lease of real property in a shopping center." 11 U.S.C. § 365(b)(3)(C). This definition of adequate assurance not only applies to assumption when a tenant has defaulted under the lease, but also to adequate assurance of an assignee's ability of future performance under section 365(f)(2)(B). *See* 11 U.S.C. § 365(b)(3), (f)(2)(B). We find that these sections evidence Congress' belief that use restrictions and tenant mix in shopping center leases are material.

Even if we were inclined to permit an insubstantial deviation from the provision, we would not make that decision here. At this time, neither Hilco/Klaff nor the Debtor are able to tell the Landlord or this Court what use will ultimately be made of the Demised Premises. By the mere nature of the Motion, it is clear that Hilco/Klaff does not intend to use the Premises itself. Absent knowledge of the ultimate intended use, we cannot determine that such use (if it does vary from the use provision of the Lease) would have an insubstantial impact on the Landlord and its other tenants.

Furthermore, the Code's treatment of use provisions in a shopping center lease undercut the Debtor's argument that they are "insubstantial." Rather, those provisions are the heart of the interdependence

of shopping center leases, as recognized by Congress in requiring an assignee to demonstrate an ability to adhere to them. They are, crucial to the tenant mix, which is designed to attract the right number and mix of customers to the mall. Thus, we conclude that section 365(b)(3) does not permit them to be stricken, even where (as the Debtor asserts) they prevent the Debtor from selling the Lease.[7] Accordingly, we will not excise the use provision from the Lease in this case.

## V. *CONCLUSION*

For the reasons set forth above, we find that the Demised Premises are part of a shopping center under section 365(b)(3), and we further find that the use provisions in the Lease cannot be excised as an anti-assignment clause. Accordingly, the Motion is denied. An appropriate Order is attached.

### *ORDER*

**AND NOW,** this **6TH** day of **MAY, 1999,** upon consideration of the Motion of Sun TV, Under 11 U.S.C. §§ 105, 363 and 365 for Assumption and Assignment of the Huntington Mall Lease to Hilco/Klaff ("the Motion"), and the briefs, affidavits, and exhibits submitted by the parties in connection therewith, for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED** that the Motion be, and the same hereby is, **DENIED.**

---

7. The Debtor presented testimony of its efforts to sell the lease to conforming users, *i.e.,* television and appliance stores, without success. (N.T. 2 at 27.) Hilco/Klaff on the other hand is willing to pay $700,000 for the Beckley lease and the Huntington Mall lease. The Creditor's Committee in its brief ascribed $550,000 of that price to the Huntington Mall lease. However, the value lost to the Debtor is irrelevant to our decision, since section 365(b)(3), as explained by *Joshua Slocum,* does not direct us to consider that factor.