**LASALLE NATIONAL TRUST, N.A., Appellant,**

v.

**TRAK AUTO CORPORATION, Appellee.**

No. CIV.A. 2:02CV466.

United States District Court, E.D. Virginia, Norfolk Division.

Jan. 10, 2003.

Jesse Ellsworth Summers, Jr., Kaufman & Canoles PC, Norfolf, VA, for appellant.

James Thomas Lloyd, Jr., Norfolk, VA, for appellee.

Paul Kevin Campsen, Jesse Ellsworth Summers, Jr., Kaufman & Canoles PC, Norfolk, VA, for movant.

Debra F. Conlon, Office of the United States Trustee, Norfolk, VA, trustee.

## MEMORANDUM OPINION AND ORDER

JACKSON, District Judge.

This matter is before the Court on appeal from the United States Bankruptcy Court for the Eastern District of Virginia, Chapter 11 Case No. 01–72167–DHA. Appellant LaSalle National Trust ("LaSalle") appeals from an April 24, 2002 Memorandum Opinion and Order (the "April 24 Order") denying LaSalle's request for reconsideration of the Bankruptcy Court's March 4, 2002 Memorandum Opinion and Order (the "March 4 Order") authorizing Appellee Trak Auto ("Trak Auto" or "Trak") to assume and assign to A & E Stores, Inc. ("A & E"), Trak Auto's non-residential real property lease (the "Lease") covering the retail store number 331 (the "Premises") located in the West Town Shopping Center (the "Shopping Center"), in Chicago, Illinois.[1] For the reasons set forth below, the Bankruptcy Court's conclusions of law and findings of fact are **AFFIRMED**

## I. FACTUAL & PROCEDURAL HISTORY

Trak Auto, prior to the commencement of this bankruptcy case on July 5, 2001, was in the business of retailing automotive parts and accessories. Trak operates out of 196 retail locations across nine states and the District of Columbia. In November 2001, in consultation with Congress, its Official Committee of Unsecured Credi-

---

1. Congress Financial Corporation (Central) ("Congress"), the principal secured lender and party in interest in the Chapter 11 case below, and A & E, who submitted the last and highest bid for the lease, join Trak Auto's brief in this appeal.

tors, and with the court-appointed consultant retained by Trak Auto to assist with its business and financial decisions, Trak decided to withdraw from its Chicago-area market (Wisconsin, Illinois, Indiana and Michigan) and to close down operations at its associated retail locations, including the Premises. The Bankruptcy Court authorized Trak Auto's termination of operations in its Chicago-area market, and liquidation of its associated assets, by Order dated November 9, 2001.

Trak Auto hired a liquidator to facilitate the court-ordered liquidation of its Chicago-area assets by advertising and selling some or all of Trak's unexpired leases, including the Lease at issue in this appeal. Trak's liquidator received a bid of $80,000 from A & E to purchase Trak's rights under the Lease, including any option periods, and to assume all liability thereafter accruing under the Lease.

The Shopping Center, where the Premises is located, consists of twenty-five (25) commercial locations, nearly all of which are retail stores. The retail mix of the Shopping Center includes a large department store, a grocery store, several clothing stores, a couple of fast-food eateries, an optician, a bank branch, an instant cash outlet, an adult/intimate products store, a laundromat, a few merchandise vendors and a branch of the Chicago Public Library. Eight unrelated stores are located in the buildings directly contiguous to the Shopping Center. These eight stores are not owned or controlled by LaSalle, however, they appear virtually indistinguishable from the Shopping Center's stores to the average shopping consumer. An additional twenty-five stores are located direct-ly across the street from the Shopping Center. These additional locations are not owned or controlled by LaSalle, but due to the interdependent nature of all the stores, the Bankruptcy Court found that these stores have a direct impact upon the retail mix of the Shopping Center.

On July 5, 2001, Trak Auto filed a Petition for Relief in the Bankruptcy Court under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code"). On December 17, 2001, Trak filed its Motion of Debtor in Possession to Assume and Assign Certain Nonresidential Real Property Leases to A & E Stores, Inc., and Notice Thereof (the "A & E Motion").[2] The A & E Motion sought authority to assume and assign Trak's Lease for the Premises, along with another store location (Store No. 325), to A & E for the aggregate bid of $75,000.00. As a result of the assumption and assignment, A & E would replace Trak Auto with its retail clothing store "Pay Half."[3] Trak also simultaneously filed its Motion of the Debtor in Possession to Assume and Assign Certain Nonresidential Real Property Leases to Family Dollar Stores, Inc., and Notice Thereof (the "Family Dollar motion"), seeking authority to assume and assign the Premises, along with another store location (store no. 341), to Family Dollar Stores, Inc. ("Family Dollar") for the aggregate bid of $40,000.00. A hearing on both the A & E and Family Dollar Motions was scheduled for January 8, 2002 before the Bankruptcy Court.

On January 4, 2002, LaSalle filed its objection to the Family Dollar Motion, citing as grounds the "restrictive use" lan-

---

2. Trak Auto remains in possession and control of its automobile parts and supply business and assets as a "debtor-in-possession" pursuant to § 1107 of the Bankruptcy Code.

3. Pay Half is a discount family clothing retail store that offers approximately twenty percent men's wear, forty percent children's wear, and forty percent women's wear. April 24 Order, p. 6.

guage contained in the lease. Section 1.1(L) of the Lease expressly provides:

> *Permitted Uses:* Sale at retail of automobile parts and accessories and such other items as are customarily sold by Tenant at its other Trak Auto Stores.

Section 8.1(B) of the Lease provides, in pertinent part:

> *Affirmative Covenants:* Tenant covenants at its expense at all times during the Lease term and such further times as Tenant occupies the Leased Premises or any part therof . . .
>
> (B) Except as otherwise provided in this Lease, to use the Leased Premises *only as a Trak Auto Store and for the Uses provided in Section 1.1(L)*
> . . . .

Brief of Appellant, p. 2. (citing Exhibit A)(emphasis in brief).

LaSalle did not separately object to the A & E Motion. On January 7, 2002, Trak Auto's liquidator conducted a telephonic auction sale of several of Trak's unexpired nonresidential real property leases, including those covered by both the A & E Motion and the Family Dollar Motion. During the auction, A & E submitted the last and highest bid for the Lease, $80,000 cash, which Trak accepted, subject to approval of the Bankruptcy Court.

Prior to the hearing scheduled for January 8, 2002, Trak Auto's counsel advised LaSalle that Trak was withdrawing the motion as it related to LaSalle's lease.[4] Apparently, Trak Auto decided not to withdraw the motion notwithstanding its prior communication to La Salle. Accordingly, on January 8, 2002, the Bankruptcy Court continued the hearing on approval of Trak's modified request to approve assumption and assignment of the Lease to A & E to January 11, 2002. At the January 11 hearing, Trak introduced, through live testimony and proffer, evidence concerning (i) the benefit to the Debtor's estate resulting form the proposed assumption and assignment of the Lease, (ii) Trak's ability to cure any sums in default under the Lease as part of such assumption and assignment, and (iii) adequate assurance of the various performance requirements of 11 U.S.C. § 365(b)(1), (b)(3) & (f)(2).

In response, LaSalle argued that its written grounds for objection to the Family Dollar Motion extended also to the A & E Motion. LaSalle proffered additional evidence including a listing of the tenants currently leasing LaSalle's other locations neighboring the Premises, and argued that Trak's proposed assignment of the Lease to A & E would upset the existing "tenant mix" at the Shopping Center. LaSalle asserted no other grounds for objection.

The Bankruptcy Court took under advisement the evidence and proffers produced at the January 11, 2002 hearing, and permitted the parties, including Congress, an opportunity to submit memoranda on the "restrictive use" and "tenant mix" objections asserted by LaSalle. On January 21, 2002, Trak and Congress each filed memoranda in support of the assumption and assignment of the Lease to A & E. On January 22, 2002, LaSalle filed its brief in opposition.

By the March 4 Order, the Bankruptcy Court provisionally granted Trak Auto authority to assume and assign the Lease to

---

4. In an e-mail from Jim Lloyd to Keith J. Ostrowski, sent January 7, 2002, 12:45 p.m., Trak's counsel stated that the motion was being withdrawn "since (a) the bidder would violate the use provisions of the lease in question, and (b) little benefit would enure to the Estate based on the current bid of $20,000 and cure of approximately $19,000 . . . and that counsel agreed that the Court cannot alter the use restriction in the lease through the motion to assume and assign." Brief of Appellant, Exhibit B.

A & E. The March 4 Order was expressly subject to LaSalle's opportunity to seek a rehearing at which time it might present further evidence. On March 14, 2002, La-Salle filed its Motion for Clarification and/or Reconsideration of Court's Memorandum Opinion and Order Dated March 4, 2002 (the "Motion for Reconsideration") and its brief in support thereof. On March 29, 2002, Congress filed its response to LaSalle's Motion for Reconsideration. On April 11, 2002, the Bankruptcy Court conducted an evidentiary hearing on LaSalle's Motion for Reconsideration.[5] At the hearing, LaSalle submitted testimony of its expert witness, Joan E. Primo ("Ms.Primo"), in support of its objection to the Debtor's assignment of the Lease to A & E. Ms. Primo testified that, in her opinion, the proposed assignment would disrupt the tenant mix at the Shopping Center. Ms. Primo also testified that the addition of A & E's store, "Pay Half," would result in an excessive amount, 20.8 %, of the Shopping Center being used for clothing sales. According to Ms. Primo, the national average for retail sales usage in a shopping center is 10%. Following the evidentiary hearing, however, the Bankruptcy Court issued its April 24 Order denying LaSalle's Motion for Reconsideration.

On June 20, 2002, after the parties presented argument during a May 10, 2002 hearing before the Bankruptcy Court, the Bankruptcy Court granted LaSalle's Emergency Motion for Stay, thereby staying Trak Auto's proposed assumption and assignment of the Lease pending appeal to this Court.[6]

## II. JURISDICTION & STANDARD OF APPELLATE REVIEW

■ Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 158(a)(1). A district court reviews a bankruptcy court's decisions of law *de novo*. *L & R Associates v. Curtis*, 194 B.R. 407, 409 (E.D.Va.1996) (citing *In re Johnson*, 960 F.2d 396, 399 (4th Cir.1992)). A district court reviews a bankruptcy court's findings of fact under a clearly erroneous standard. FED. R. BANKR. P. 8013; *Lubrizol Enterprises v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir.1985).

When reviewing for clear error, an appellate court must give due regard to the opportunity of the trial court to judge the credibility of witnesses. *See W.F. Magann Corp. v. Diamond Mfg. Co., Inc.*, 775 F.2d 1202 (4th Cir.1985). If the trier of fact's account of evidence is plausible in light of the record, viewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as trier of fact, it would have weighed evidence differently. *Amadeo v. Zant*, 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988); *Hall v. Marion School Dist. No. 2*, 31 F.3d 183 (4th Cir.1994); *see also*, FED. R. CIV P. 52(a). Indeed, where there are

---

**5.** On March 5, 2002, LaSalle filed a motion for an order to compel Debtor to pay amounts due under § 365(d)(3) of the Bankruptcy Code as administrative relief, and for relief from the automatic stay to pursue state court proceedings or other relief. LaSalle amended that motion on March 12, 2002. That Motion was also set for hearing before the Bankruptcy Court on April 11, 2002.

**6.** LaSalle filed its emergency motion because Congress indicated its intention to proceed

with the closing on the sale of the Lease to A & E, notwithstanding LaSalle's Motion for Stay. As a condition of granting the Emergency Motion, the Bankruptcy Court required LaSalle to post a bond in the amount of $25,000, which LaSalle deposited with the Court on May 8, 2002. Also, the Order Granting Stay Pending Appeal, entered on June 20, 2002, required LaSalle to post a bond of $80,000 with the Bankruptcy Court.

two permissible views of evidence, the fact finder's choice between them cannot be clearly erroneous even when the court's findings do not rest on credibility determinations but are based instead upon physical or documentary evidence or inferences from other facts. *American Original Corp. v. Jenkins Food Corp.*, 774 F.2d 459 (Fed.Cir.1985).

## III. DISCUSSION

Appellants seek review of the Bankruptcy Court's April 24 Memorandum Opinion & Order denying Appellee's Motion for Reconsideration of its March 4 Order, concluding that:

(A) The "permitted use" provisions of the Lease are *de facto* anti-assignment clauses subject to excision under § 365(f) of the Bankruptcy Code; and

(B) The assumption and assignment of the Lease will not disrupt the tenant mix of the Shopping Center under § 365(b)(3)(D) of the Bankruptcy Code; and

(C) Trak Auto's decision to assume and assign the Lease is in the best interest of the Debtor's Estate as a valid exercise of its business judgment under § 365 of the Bankruptcy Code.

### A. *De Facto* Anti–Assignment Clauses

The Bankruptcy Court held that the "Permitted Use" and "Affirmative Covenants" provisions of the Lease were *de facto* anti-assignment clauses and, therefore, excised them from the Lease under § 365(f) of the Bankruptcy Code. The Bankruptcy Court noted that, although the debtor is required to assume its unexpired leases *cum onere,* and that courts cannot rewrite a debtor's lease, provisions therein that prohibit assignment outright are unenforceable under § 365(f)(1) of the Bank-

ruptcy Code. March 4 Order, p. 23–24 (citing *In re Rickel Home Centers, Inc.*, 240 B.R. 826, 831 (D.Del.1998)). Relying principally upon *Rickel,* the Bankruptcy Court concluded that the Lease's use restrictions, limiting use of the Premises to the sale of automobile parts and accessories, were so restrictive that they constitute *de facto* anti-assignment clauses. *See id.* LaSalle argues that the Bankruptcy Court's conclusion on this issue is erroneous and that the Court cannot excise a restrictive use provision in a nonresidential lease under § 365(b)(3). LaSalle relies heavily upon *In re Sun TV & Appliances, Inc.*, 234 B.R. 356, 370–71 (Bankr.D.Del. 1999) for the proposition that courts may not strike use provisions in leases even when those provisions prevent assignment of the lease. Brief of Appellant, p. 8. The Court concludes that the Bankruptcy Court's conclusion on this issue is correct.

■ In order to assume and assign a lease or executory contract, a debtor typically need only cure any arrearage and provide adequate assurance of future performance of the lease or contract. 11 U.S.C. § 365(b)(1). Section 365(b)(1) of the Bankruptcy Code provides:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee-

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1)(A)-(C).[7] In the case of shopping center leases, however, Congress has placed additional restrictions on the right to assume and assign. *See* 11 U.S.C. § 365(b)(3). Section 365(b)(3) of the Bankruptcy Code provides, in relevant part:

> (3) For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—
>
> (A) of the source of rent and other consideration due under such lease and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;
>
> (B) that any percentage rent due under such lease will not decline substantially;
>
> (C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as radius, location, use or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and
>
> (D) that assumption or assignment of such lease will not disrupt any ten-

ant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3)(A)-(D).

In order to determine if the additional restrictions of § 365(b)(3) apply to the Lease, the Court must determine whether the Lease is a "shopping center lease." *In re Sun TV*, 234 B.R. at 359–60. Despite Ms. Primo's testimony concerning community shopping center standards, Trak Auto points out that LaSalle failed to put on evidence indicating why the West Town Shopping Center is or should be analyzed like, a community shopping center under § 365(b)(3). Trak Auto argues that the West Town Shopping Center, though labeled a shopping center, does not resemble a typical suburban community-retail center. Trak argues that the Shopping Center is much more "like a downtown shopping district, within walking distance of offices and apartment buildings." Brief of Appellee, p. 4. Trak further contends that the Shopping Center is merely part of a cluster of buildings located next to and near each other, which are owned by different property owners. And, these various property owners have no ability to control the tenant mix of their neighbors. *Id.*

 The United States Court of Appeals for the Third Circuit ("Third Circuit") has provided guidance concerning the factors to consider in determining whether a lease falls within § 365(b)(3). *See In re Joshua Slocum Ltd.*, 922 F.2d 1081 (3d Cir.1990); *see also, Sun TV*, 234 B.R. at 360. According to the Third Circuit, "[w]hile it is true that the mall is the archetypal 'shopping center,' all shopping centers do not necessarily take the form of shopping malls." *Joshua Slocum*, 922 F.2d at 1087–88. The court compiled sev-

---

**7.** Although § 365 refers to the trustee, a debtor-in-possession may exercise the power of the trustee to assume executory contracts and unexpired leases. *See* 11 U.S.C. § 1107(a).

eral factors taken from other bankruptcy cases and treatises noting that "[l]ocation is only one element in the determination of whether a group of stores can properly be described as a 'shopping center.'" *Id.* The following factors are indicative of a shopping center:

(a) A combination of leases;

(b) All leases are held by a single landlord;

(c) All tenants engaged in the commercial retail distribution of goods;

(d) The presence of a common parking area;

(e) The purposeful development of the premises as a shopping center;

(f) The existence of a master lease;

(g) The existence of fixed hours during which all stores are open;

(h) The existence of joint advertising;

(i) Contractual interdependence of the tenants as evidenced by restrictive use provisions in their leases;

(j) The existence of percentage rent provisions in their leases;

(k) The right of the tenants to terminate their leases if the anchor tenant terminates its lease;

(*l*) Joint participation by tenants in trash removal and other maintenance;

(m) The existence of a tenant mix; and

(n) The contiguity of the stores.

*Joshua Slocum,* 922 F.2d at 1087–88 (citations omitted). The Court notes that the Bankruptcy Court failed to undertake a detailed analysis and make a specific finding of fact on this issue. Because this issue has not been specifically raised on appeal, however, for purposes of this appeal the Court assumes that the West Town Shopping Center is a "shopping center" under § 365(b)(3).[8]

 Section 365(b)(3)(C) provides that the assumption and assignment of a shopping center lease must be *cum onere,* that is "subject to existing burdens." *In re Chicago R.I. & Pac.,* 860 F.2d 267, 272 (7th Cir.1988); 11 U.S.C. § 365(b)(3)(C). This section has been interpreted to mean that the Debtor is not free to select only those lease terms which it deems to be favorable, but rather must assume and assign the lease as a whole and is not free to accept the favorable terms while discarding the unfavorable. *United States v. Carolina Parachute Corp.,* 907 F.2d 1469, 1472 (4th Cir.1990); *Lee v. Schweiker,* 739 F.2d 870, 876 (3d Cir.1984). Section 365(b)(3) is not meant to be read in isolation, however. Section 365(b)(3) must be read in conjunction with the section that it cross references, § 365(f). *In re Rickel Home Centers, Inc.,* 240 B.R. 826, 831 (D.Del.1998). Section 365(f)(1) provides, in relevant part:

> Except as provided in subsection(c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease,

---

**8.** Given the detailed analysis undertaken by other Bankruptcy Courts, *see Sun TV, supra,* the Court finds that a summary finding is not appropriate. Nevertheless, the Court concludes that a finding on this issue is immaterial to the outcome of this appeal. If the Bankruptcy Court had found that the West Town Shopping Center is a "shopping center" under *Joshua Slocum,* the Court would reach the same result it would reach if the Court were to find that it is not a shopping center.

If it is a shopping center, then § 365(b)(3) applies and this Court finds, *infra,* that the Bankruptcy Court's conclusion that the use restrictions are anti-assignment clauses was proper. If it is not a shopping center, then § 365(b)(3) does not apply and the general and more liberal rule permitting assumption and assignment of unexpired leases applies and the Bankruptcy Court's decision would also be proper.

the trustee may assign such contract or lease under paragraph (2) of this subsection....

11 U.S.C. § 365(f)(1). Courts have interpreted § 365(f)(1) to permit the Court to excise actual and *de facto* anti-assignment clauses. *De facto* anti-assignment clauses are typically those lease restrictions that can only be met by the original tenant. *Rickel Home Centers*, 240 B.R. at 831 ("in interpreting § 365(f), courts and commentators alike have construed the terms not only to render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute *de facto* anti-assignment provisions.")

■ The Bankruptcy Court below found that the "permitted use" provisions of the Lease amounted to *de facto* anti-assignment provisions. April 24 Order, pp. 3–4. The Bankruptcy Court noted that:

> While debtor is required to assume its unexpired leases *cum onere* and is not permitted to rewrite the terms of the lease in assuming it, when the provisions of the lease violate the explicit commands of the Bankruptcy Code, this Court must strike those offending portions but give effect to the remaining non-offending parts of the lease.

April 24 Order, pp. 3–4 (citing *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 172 (Bankr.E.D.Va.1993); *In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D.Del.1998)). The Bankruptcy Court's conclusion of law is correct. Applying the law, the Bankruptcy Court relied upon its finding that the area surrounding the Shopping Center is saturated with auto parts stores such that no auto parts retailer even bid on the Lease and concluded, therefore, that the "market indicates that such a restriction would amount to an anti-assignment clause." April 24 Order, p. 4. Although the Bankruptcy Court relied

heavily on indicia of market saturation, this Court need not rely on anything other than the plain language of the Lease to conclude that the restrictive use provisions prohibit assignment of the Lease to anyone other than the original tenant. *Rickel Home Centers*, 240 B.R. at 831.

As cited in Appellant's Brief, Section 8.1(B) of the Lease provides, in pertinent part:

> *Affirmative Covenants:* Tenant covenants at its expense at all times during the Lease term and such further times as Tenant occupies the Leased Premises or any part thereof ...
>
> (B) Except as otherwise provided in this Lease, to use the Leased Premises *only* as a *Trak Auto Store and for the Uses provided in Section 1.1(L)*....

Brief of Appellant, p. 2. (citing Exhibit A)(emphasis in brief). Under this language, the "Leased Premises" may be used "only as a Trak Auto Store." *Id.* Clearly, no one other than Trak Auto could meet this requirement and, consequently, Trak would be *ipso facto* prohibited from assuming and assigning the Lease if this use restriction was enforced. Accordingly, the Bankruptcy Court properly excised the offending provisions of the Lease while giving effect to the remaining provisions regardless of the status of the relevant market area.

**B. Tenant Mix**

■ The Bankruptcy Court's finding that assumption and assignment of the lease will not disrupt the tenant mix of the shopping center is a factual finding that this Court reviews only for clear error. As stated above, clear error review does not authorize this Court to reverse the trier of fact below merely because it may have decided the factual question differently. *Hall v. Marion School Dist. No. 2,*

31 F.3d 183 (4th Cir.1994). The Bankruptcy Court's factual findings, therefore, will be upheld if they are supported by the record. *Amadeo v. Zant*, 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). The Court concludes that the Bankruptcy Court's factual finding concerning the effect of the assumption and assignment of the Lease on the tenant mix of the Shopping Center are not clearly erroneous because they are supported substantially by the record.

First, LaSalle argues that the Bankruptcy Court's decision contravenes the legislative history of § 365(b)(3)(D) of the Bankruptcy Code. LaSalle points to a congressional statement that "the tenant mix in a shopping center may be as important to the lessor as the actual promised rent payments ...." Brief of Appellant, p. 15 (citing *In re Joshua Slocum Ltd.*, 922 F.2d 1081 (3d Cir.1990))(legislative history citation omitted). LaSalle argues that Congress enacted § 365(b)(3)(D), which requires that "assumption and assignment of [a debtor's unexpired lease] will not disrupt any tenant mix or balance in such shopping center," with the above intent in mind. Therefore, the Bankruptcy Court's finding that adding an additional clothing store, A & E's "Pay Half," would not disrupt the tenant mix of the Shopping Center is erroneous. LaSalle's argument is unpersuasive.

LaSalle's treatment of the tenant mix existing prior to Trak Auto's default seems to conflict with the legislative history that it urges this Court to consider. According to Joan Primo, LaSalle's expert, that national average for retail clothing stores in a shopping center is 10%. *See* Testimony of Joan Primo, April 11, 2002 hearing. Yet, prior to Trak Auto's default, the tenant mix of the Shopping Center was almost 3% over the national average presented by its expert. This is a result of LaSalle's own contractual negotiations with its other tenants. In fact, the record supports a finding that the tenant mix was in excess of the national average by more than 5%.[9] Ms. Primo testified that the addition of A & E's Pay Half store would increase retail clothing usage to 20.8%, an excessive amount in her opinion. *Id.* Prior to Trak Auto's default, however, Ms. Primo indicated that the West Town Shopping Center was already operating with a conservative estimate[10] of 12.7% of its stores engaged in retail clothing sales. *Id.* Because Ms. Primo's estimate neglected space in other stores, the Bankruptcy Court ultimately found that 15.3% of the Shopping Center's tenants were engaged in retail clothing sales. April 24 Order, p. 6. Accordingly, it was not erroneous for the Bankruptcy Court to conclude that, notwithstanding the legislative history of § 365(b)(3)(D), LaSalle cannot credibly complain of a 5% increase (from 15.3% to 20.8%) in retail clothing scales, when LaSalle itself had already allowed the tenant mix to be disturbed by that same proportion.

Additionally, when reviewing the decision below for clear error, the Court must

---

**9.** See n. 9, *infra*

**10.** The Bankruptcy Court found that Ms. Primo's testimony was based upon the total square footage of each store and does not take into account that the landlord has indicated that there is space available in two of the stores used to reach the reported result. Also, Ms. Primo's figures did not reflect that fact that Big K, one of the largest retailers in the plaza, would place the landlord "well above the average for a shopping center" even if only one-fifth of Big K's total square footage is presumed to be used for the sale of clothing, thus resulting in approximately 15.3% of the shopping center's space being used for clothing sales prior to the addition of Trak's proposed assignee, A & E's Pay Half.

give substantial deference to the trier of facts credibility assessment and the relative weight it accorded to a witnesses testimony. The record reveals several contradictions in Ms. Primo's testimony, any one of which would justify the Bankruptcy Court in finding Ms. Primo's testimony less than credible and, therefore, entitled to little or no weight at all. For example, even Ms. Primo testified that the configuration of the Shopping Center "is a little interesting and *unusual* in that part of the center is really, to the consumer, Milwaukee Street retailing." Brief of Appellant, p. 17 (quoting Testimony of Joan Primo at April 11, 2002 Hearing)(emphasis added). According to Ms. Primo's testimony, La-Salle has little control over the impact of tenant mix on its shopping center because "[t]here are a lot of other apparel retailers [on Milwaukee Street]." *Id.* Ms. Primo also testified that "not only do we have a good amount of apparel in the center *per se,* but you also have a fair amount right on the street, with a very large Rainbow Store at the corner and Payless Shoes and a number of other independents along the street." *Id.* This evidence would support a factual finding that the LaSalle lacks control over the impact of tenant mix on the Shopping Center and, therefore, does not come within the protection of § 365(b)(3)(D). This testimony also seems to contradict Ms. Primo's testimony on the detrimental impact assumption and assignment to A & E would have on the Shopping Center.

Moreover, Ms. Primo also testified that the addition of another apparel retailer like A & E's Pay Half store would "not enhance the mix at all and would detract further in that right now a Trak Auto or an auto store appeals to the male customer... [and] it brings a different customer to the center than is already coming to the center for those apparel retailers" *Id.* However, the record clearly establishes that other stores sell men's clothing. One of the Shopping Center's largest tenants, Big K, sells mens and women's clothing along with hardware and automotive items that appeal to "the male customer." Therefore, the record supports a finding that the absence or presence of an auto parts store, or its replacement with an apparel store, does not significantly impact the tenant mix of the Shopping Center. Furthermore, Ms. Primo testified that she believes that an auto parts store will attract a "substantially different customer." *Id.* On the other hand, her testimony conflicts with that point in that she admits that there is not likely to be much crossover shopping at the Shopping Center. She states, "I don't go shopping for apparel and then just decide to pick up some spark plugs. That is an infrequent type of purchase." *Id.* at 19. Just as it is unlikely that a woman who goes shopping for panty hose will decide to "pick up some spark plugs," it is equally unlikely that a man who goes shopping for spark plugs will opt to purchase some panty hose or other apparel while at the Shopping Center. La-Salle cannot use the cross over argument as a sword and a shield.

Finally, as a predicate to finding that a Shopping Center is entitled to protection under § 365(b)(3)(D), the lessor must demonstrate that there was an intended tenant mix in the first instance. *See In re Sun TV,* 234 B.R. at 366–67. Intent to create a diverse tenant mix must be established in light of the lease terms. *In re Ames Department Stores, Inc.,* 121 B.R. 160, 165 (Bankr.S.D.N.Y.1990). In order to establish that the proposed assignment to A & E would disturb the tenant mix of the Shopping Center, La-Salle must establish that the alleged tenant mix was part of the bargained-for-exchange of its lease and the leases of the other tenants. *Id.*

LaSalle argues that the Lease contains exclusive use clauses which are binding on any subsequent assignee and, that these use provisions create a tenant mix. However, the Bankruptcy Court found that the lease contained restrictive use provisions, which as discussed *supra* at Part A., were properly excised under § 365(b)(1), because LaSalle failed to carry its burden of production on the existence of exclusive use clauses in its leases. April 24 Order, p. 8. As the Bankruptcy Court noted, the "purpose of an exclusive use clause is to provide protection to a single tenant." April 24 Order (citing *In re Sun TV, supra*). The Bankruptcy Court found that it lacked "any evidence relating to the intent behind the use provisions" and, therefore, held that the "debtors lease contained only restrictive use clauses." *Id.* at 9. Appellate review of the record reveals no evidence concerning the intent of the use provisions and Appellant's brief fails to assert any.[11]

The Bankruptcy Court also properly considered the restrictive use provisions in the leases and found that the "leases for this shopping center do not contain complementary restrictive use provisions that are designed to show the landlord's intent to create a diverse tenant mix." *Id.* at 10. Indeed, the Bankruptcy Court properly noted that "[n]one of the leases contain provisions that restrict the number of tenants that may have clothing as their only merchandise or that limit the square footage of the shopping center that may be devoted to the sale of clothing." *Id.* Accordingly, the Bankruptcy Court's finding

that there was no intent to create a diverse tenant mix in the first instance, and consequently, that LaSalle is not entitled to protection under § 365(b)(3), is not clearly erroneous.

Accordingly, it was not erroneous to for the Bankruptcy Court to conclude that the addition of another apparel retailer would not disrupt the tenant mix.

**C. Best Interest of the Debtor's Estate.**

█ LaSalle argues that the Bankruptcy Court clearly erred by finding that the assumption and assignment of the Lease to A & E is in the best interests of the Debtor's Estate. Given the high level of deference a court must give to a debtor so long as the transaction appears to enhance the value of the estate, this Court will not reverse the Bankruptcy Court's findings unless it is apparent that the assumption and assignment will impair the value of the Debtor's Estate. Brief of Appellant, p. 23 (citing *Richmond Leasing v. Capital Bank*, 762 F.2d 1303, 1309 (5th Cir.1985)). Because LaSalle was successful in obtaining a stay of this action pending appeal to this Court, the amounts due under the lease shall not accrue from and after March 4, 2002. *See* June 20, 2002 Order Granting Stay Pending Appeal, ¶ C. Accordingly, LaSalle's assertion that the amount due under the lease, as of submission of its brief, has increased to $81,588.72 is incredulous and incorrect. Because the cure amount as of the Bankruptcy Court's Stay Order is undoubtedly less than the amount bid by A & E,[12] authorization of

---

11. As the Appellee points out in its brief, Ms. Primo, LaSalle's only expert witness, "failed to address any lease terms with other tenants, but rather limited her opinion to 'general notions of tenant mix'" which the *Ames* court, and the Bankruptcy Court below, held to be insufficient.

12. The Bankruptcy Court noted in its April 24 Order that the overall positive impact for Debtor's estate was approximately $18,000. According to Appellant's brief, as of the April 11, 2002 hearing, the cure amount was $53,235.90. The Court has no evidence suggesting that the cure amount increased by $30,000 between April 11 and June 20, 2002.

the assumption and assignment transaction "appears to enhance the value of the estate." The Bankruptcy Court's finding, therefore, is not clearly erroneous.

## IV. CONCLUSION

For the reasons set forth above, the Bankruptcy Court's conclusions of law are correct and its findings of fact are not clearly erroneous. Accordingly, the decision of the Bankruptcy transaction "appears to enhance the value of the estate." The Bankruptcy Court's finding, therefore, is not clearly erroneous.

## V. CONCLUSION

For the reasons set forth above, the Bankruptcy Court's conclusions of law are correct and its findings of fact are not clearly erroneous. Accordingly, the decision of the Bankruptcy Court below is **AFFIRMED** and Appellant's appeal is **DISMISSED**.

The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion & Order to the parties.

IT IS SO **ORDERED**.

Accordingly, this Court accepts as fact that the cure amount as of the Bankruptcy Court's June 20, 2002 Order was less than the $80,000 bid by A & E, therefore, the assumption and assignment would result in a net benefit to the Debtor's estate. In any event, LaSalle has put forth no evidence, other than its incredible argument above, that the transaction will have a detrimental effect upon the estate.